**HENRY BARRACKS HOUSING CORPORATION**

v.

**UNITED STATES.**

No. 524–58.

United States Court of Claims.
July 15, 1960.

Bernard J. Gallagher, Washington, D. C., for plaintiff.

Carl Eardley, with whom was Asst. Atty. Gen., George Cochran Doub, for defendant. Max L. Kane, Washington, D. C., was on the briefs.

DURFEE, Judge.*

This case presents the court with the problem of what liability, if any, the Government has to the operator of a Wherry Housing project who defaults on his mortgage payments because the project is not occupied by the number of tenants who were originally determined to be necessary to insure profitable operation.

Plaintiff is a Puerto Rican corporation which, in the latter part of 1953, communicated a desire to the Department of the Army Corps of Engineers to be considered as a prospective sponsor for a housing project at Cayey, Puerto Rico, which would be occupied by the military and civilian personnel assigned to Henry Barracks military post. The project was of the type contemplated by Title VIII of the National Housing Act, as amended, 63 Stat. 570, 571; 12 U.S. C.A. § 1748, known as the Wherry Housing Act.

After receiving notification that it had been selected to sponsor the project, plaintiff obtained a mortgage loan insured by the Federal Housing Administration (FHA) and entered into a seventy-five year lease with the Government at a nominal rental of public lands on which the project was to be erected.

Plaintiff began construction in October 1954. At about the time that the project was completed the local newspapers reported that the Army intended to deactivate Henry Barracks. Plaintiff had at no time previously been informed of this contemplated action, but it was confirmed by Army spokesmen in December 1955.

Despite attempts made by plaintiff to obtain the use of post facilities like the officers' club and swimming pool in order to attract tenants from the island's population-at-large, the project operated with a high percentage of vacant units because of the transfer of the personnel for whom the housing had been built away from Henry Barracks. Because of this development, plaintiff was unable to maintain the mortgage payments on the project and the holder of the mortgage foreclosed. The mortgagee purchased the property at public sale and subsequently transferred it to the FHA in return for Government debentures.

The plaintiff has alleged in its petition that certain representations made by the defendant induced it to sponsor the project, and that the deactivation of Henry Barracks was a breach of the contract between plaintiff and defendant. Plaintiff asks damages which include the loss of anticipated earnings for the period of the lease and the loss of capital invested in the construction.

The Wherry Housing Act was enacted as a means of encouraging private investors to engage in the construction of rental housing which would serve the needs of military and civilian personnel on duty at military installations. Decent housing is an essential morale factor in the creation and continuation of a skilled military establishment and the Act was intended to result in the construction of such housing. Prior to the passage of the Act this type of housing was distinctly unattractive to private builders because the military installations were

---

* Riverview Manor, Inc. and Riverview Manor Annex, Inc. v. United States, No. 93–59, also a claim by the operators of a Wherry Housing project for damages following the failure of the project, is ruled by this opinion and a similar order will be entered. There are certain factual distinctions between the two cases, for example: the alleged misrepresentations by the Navy are said to be contained in that part of the certificate of need which avers that the project is necessary to adequately house the installation personnel, as well as in the project analysis and the eligibility and appraisal form. The reason for the inaccurate estimate as to the number of units needed, which estimate was made in good faith, appears to be a combination of miscalculation, coolness of the civilian and military personnel toward the project, and the changing mission of the Indian Head, Md., Naval Powder Factory. Despite these factual distinctions, our holding in this case with respect to the nature of the certificate of need and the intention of Congress regarding contractual and statutory liability for inadequate occupancy, is apposite to that case, and recovery must be denied.

often located in isolated areas. Ordinarily, the operators of such housing would have had to rely on the Government installation for its services and utilities as well as for the land on which to build. Imperiling operations still further from the viewpoint of private capital was the fact that the relative impermanency of military installations would make such housing subject, over the long run, to sudden reductions in the number of potential tenants.

The legislation aimed to remove the unattractive features of military housing investment through three major provisions: (1) a special form of mortgage insurance would be made available up to 90 percent of the replacement cost so that the builders could obtain the necessary financing, (2) the building sites would be leased to the builders by the Government on a long term, nonrevocable basis, and (3) utilities would be provided by the nearby installation on a long term basis.

At the time of the enactment of Title VIII, Title VI of the National Housing Act, 55 Stat. 55, was in effect providing for mortgage insurance by the FHA if it found that the project for which the loan was requested was an "acceptable risk." Title VI was obviously inappropriate as a basis of mortgage insurance on housing built near isolated military posts because the questionable permanency of the prospective tenants made such housing not an "acceptable risk," by FHA standards. Consequently, the major distinction between Title VI and Title VIII (Wherry Housing) is that Title VIII permits the FHA to issue the mortgage insurance if the Secretary of the military department concerned furnishes a certificate of need for the housing which the FHA could regard in the same manner as the finding of "acceptable risk" in Title VI.

The pattern of events which culminated in the building and operation of Henry Barracks housing is representative of the procedure followed in any Wherry Housing project. Contemporaneously with its receipt of notification of acceptance as sponsor, the plaintiff received from the Army certain information pertaining to construction and operation of the housing. Among other things, the informational letter revealed that the construction and operation of the project would be subject to certain controls by the defendant. Proceeding on the information contained in the letter, plaintiff executed a 75-year lease with the defendant at a rental of $100 per annum, obtained the financing for the project, and secured FHA insurance on the mortgage.

As noted above, a prerequisite to the securing of mortgage insurance was the furnishing to the FHA of a certificate of need from the Secretary of the Army which said:

"In accordance with the provisions of Section 803(b) (2) of Title VIII of the National Housing Act, the undersigned, as the duly authorized designee of the Secretary of Defense, hereby certifies that:

"the above identified housing project is necessary to provide adequate housing for civilian or military personnel (including Government contractors' employees) assigned to duty at the military installation named above; such military installation is deemed to be a permanent part of the Department of the Army;

"there is no present intention to substantially curtail the activities at such installation; and

"based on the official records of the said Department, the military and civilian personnel who will be expected to occupy the dwelling units described above and for whom the project is intended, should be able to pay the proposed average monthly rentals per family unit as stated."

This certicate was furnished to plaintiff who forwarded it to the FHA with its application for mortgage insurance.

The informational letter received by the plaintiff at the time of his selection as sponsor indicated that the approved rental schedule for the project would be

based on a net return not to exceed 6½ percent of the estimated replacement cost, and plaintiff was also informed that maximum rentals would be prescribed by the defendant. The project analysis subsequently issued by the FHA for Henry Barracks housing estimated annual and net incomes and operating expenses for the project and estimated the occupancy at 97 percent of capacity. Plaintiff obtained a mortgage loan in the amount of $631,100 which was 90 percent of the FHA estimated replacement cost, as provided in the statute, and the amount of the construction capital not borrowed was covered by direct investment of the plaintiff.

This is the first time that we have been called upon to interpret the Wherry Housing portion of the National Housing Act, and so a discussion in some detail is in order. The plaintiff argues that it relied to its detriment on certain representations contained in the certificate of need and the lease. The allegations of breach of contract seem to raise the question of whether the defendant made any expressed or implied promise that the Army and civilian personnel assigned to Henry Barracks would not be curtailed, or that it would not be deactivated, thereby agreeing to guarantee an adequate rental income on the housing project.

The defendant, on the other hand, takes the position that there is no contractual guarantee of permanency of Henry Barracks or full occupancy of the project, that there is no statutory obligation to compensate for reduced tenancies resulting from curtailed activities, and that the Government made no representations on which a theory of detrimental reliance can be based.

The plaintiff's motion indicates that the representations on which it relies are to be found in the certificate of need and are repeated in the lease. It maintains that these contractual representations were breached when Henry Barracks was deactivated soon after the project was completed and the implication is that these documents warranted or guaran-

teed that operations at the post would be continued in an undiminished fashion. Plaintiff reasons that since the lease specified that it was designed to effectuate the purpose of Title VIII, and since the purpose of Title VIII was to relieve the existing shortage of housing adjacent to military posts resulting from the uncertain permanency of such posts, there was a representation of permanency of the installation contained in the lease.

The working provisions of the lease at no point provide for the continued operation of Henry Barracks nor is it even implied that the sponsor is to be guaranteed against inadequate tenancy resulting from deactivation or any other cause. In fact, the lease provision which permits the operator to rent to persons unconnected with the post, in the event that the military does not occupy the units, indicates that the Government was leaving the operator free to take steps to help himself in the event of undertenancy.

██ Plaintiff also feels that the ownership of the housing project by the Government, and its right to control the operation thereof, places plaintiff at the mercy of the defendant. We think, however, that such features appearing in a lease which extended far longer than the expected life of the improvements were for plaintiff's benefit to insure that the project would continue until it was free of obligations. In effect, the title to the whole operation which resposed in the defendant was really only a paper title and the lease provisions were for plaintiff's benefit. Offutt Housing Co. v. Sarpy County, 1956, 351 U.S. 253, 261, 76 S.Ct. 814, 100 L.Ed. 1151; Sheridanville, Inc. and Fort Dix Apartments Corporation v. Borough of Wrightstown, D.C., 125 F.Supp. 743, 753, affirmed 3 Cir., 1955, 225 F.2d 473, certiorari denied 351 U.S. 962, 76 S.Ct. 1024, 100 L.Ed. 1483.

██ It is the belief of the housing corporation that the certificate of need first enunciated the representations it insists were made. The exact language

of that document has been reproduced above. From both the wording of the certificate and its channeling from the Army to the FHA through plaintiff, it seems quite clear that its purpose was not to provide any guarantees or assurances to the builder but rather to assure and protect the FHA and satisfy the statutory prerequisite to issuing the mortgage insurance. It need hardly be stated that at the time of passage of the Act in 1949 the Congress must have been aware that the requirement for a fluid military establishment made it impossible to represent that a military installation would not be deactivated or curtailed for the indefinite future.

We are unable to find anything in the congressional hearings and reports which suggests that there was any intent that the certificate be a warranty, guarantee, or representation of the statements made therein. Language and logic reveals the contrary to be true. No responsible representative of the Defense Department could intelligently have said that an installation *was* permanent and that the activities *would not* be curtailed. Such assurances simply could not be given. There was a very good reason, then, for the Secretary to use the words *"deemed* to be a permanent part" and "no *present intention* to substantially curtail the activities." This language, of course, closely parallels the language of the statute.

The unreality of suggesting that these words convey a present unequivocal representation of permanency and full occupancy can be seen when we attempt to apply similar reasoning to the final clause of the certification. Thus, the phrase "the * * * personnel who will *be expected* to occupy the dwelling units * * * *should be able* to pay the proposed * * * rentals * * *" would have to be read as a guarantee that they *would* occupy the project and that they *would* be able to pay the proposed rentals, even though they might *prefer* to remain in inferior or inadequate quarters or to use the part of their income which most people would spend for housing on other necessities or on luxuries. And it must be recognized that the commanding officer had no authority to order his civilian personnel to occupy the housing if they were not so disposed.

The efficacy of the certificate of need has been ruled on by the Tenth Circuit Court of Appeals in a case in which the Government was attempting to foreclose against the operators of a Wherry Housing project. Deseret Apartments, Inc. v. United States, 1957, 250 F.2d 457, 458. The defendant attempted to set off its operating loss against the foreclosure deficiency judgment, claiming that it had relied on the certificate of need when, in fact, there had been no real need for the housing to accommodate the personnel at the military post. There was no question as to the good faith of the Government, and the court decided that the court below had correctly disallowed the set-off. It said at page 458:

"* * * The Government did not guarantee to Deseret that the units would be occupied at a rental sufficient to pay the cost of construction. To so hold would be to convert a representation of need into a warranty that such need was present and would continue. It is true that subsequent to the issuance of the certificate the Governmental activities were curtailed, resulting in a further lessening of the demand for these rental units. But this was not done until 1955, nearly two years after the certificate was issued. The certificate recognizes that activities might be curtailed in the future if required by Government policy. It merely provided that 'there is no present intention to substantially curtail the activities at such installation; * * *.' "

Of necessity, then, the certificate was a combination of considered opinions, e. g., that the housing to be built was necessary to provide adequate housing at the installation, and narrowly worded factual statements, e. g., that the post was *"deemed"* to be permanent and that there was no *"present intention"* to cur-

tail activities. The conclusion that must be drawn from the creation, wording, and utilization of the certificate of need is that it made no representations, guarantees, or warranties of permanency or occupancy, and that it was issued for the benefit of the FHA as a signal to issue the mortgage insurance and not for the benefit of the builder or operator.

As to the question of whether, in the absence of any contractual right to damages, Congress created a statutory right when it passed the Act, we have already pointed out that the primary purpose of the Act was to relieve the shortage of housing near military installations and that there were obstacles to attracting private building capital. We have also seen that this legislation was aimed at overcoming them. Congress could and did provide for long term leases of public lands and for the ready availability of utilities and services. It could not, however, guarantee that any military installation would remain indefinitely a part of the permanent military establishment. Rapid development of novel weapons systems, an ever-changing international political climate, and continuous financial reappraisals are factors which are so self evident as to scarcely require comment. Yet they are factors which must control the size and location of the armed forces and the continuation of their facilities if the national interest is to be served.

The risk of loss of rentals which might result from a sudden shift in defense forces had to be diminished if capital was to become available for Wherry housing. The provision in the Act for mortgage loan insurance up to 90 percent of the FHA estimated cost of replacement was designed to lessen the reluctance of financing institutions to participate in such a program. While the risk of loss from default was substantially shifted from the financing institution to the Government, thus enabling builders to more readily obtain financing for the contemplated housing, whether the project would continue to be profitable still involved a certain degree of gamble by the landlord on adequate occupancy, which is true of the operation of any rental real property.

As we have already noted, Title VIII closely resembles Title VI of the National Housing Act with, however, one major distinction. Whereas under Title VI the FHA could issue mortgage insurance on a construction project if it found the loan to be an "acceptable risk," it was permitted to issue insurance under Title VIII only if the Secretary furnished a certificate of need. The FHA could not have averred that Wherry housing was an "acceptable risk" over the long mortgage period, so Congress devised the certificate of need to encourage private capital and to inject the necessary degree of assurance for the FHA into the picture.

The intent of Congress, then, was that the certificate of need would serve as a substitute for the finding of "acceptable risk." There is nothing in the legislative history of the Act to suggest that Congress intended that the certificate of need would extend Government liabilities beyond those undertaken by the other portions of the National Housing Act. The certificate was no more a guarantee for the builder than was the finding of "acceptable risk."

The statute itself prescribes the use of such terms as "deemed to be permanent" and "no present intention" to curtail activities. We think that this reflects a congressional recognition of the necessary long term impermanence of military posts, but to read into this an intent by the legislators to guarantee rental incomes where such deactivation occurs is an unwarranted supposition.

If the certificate is in the nature of a guarantee of full occupancy, the statutory provisions for the detailed steps to be taken by the parties in the event of default are meaningless because the mortgagor never would be in default. No such meaningless acts should be ascribed to Congress. Would Congress have provided for insurance of the long term loans if it intended to guarantee profitable operations based on full occupancy as plaintiff suggests in its prayer for re-

lief? Clearly, the answer must be no. The hearings and reports do not indicate that Congress intended to depart from the pattern of earlier sections of the National Housing Act by assuming the responsibility of absolute insurer of the profitable operation of Wherry housing projects.

There can be no question of misrepresentations in the lease or certificate because, as we have seen, no representations as to permanency or occupancy were made. Moreover, the Army's good faith in issuing the certificate is not in question. The fact that conditions changed within a few years of the issuance of the certificate does not mean that it was not honest and accurate when executed. Furthermore, the claim of detrimental reliance on the alleged misrepresentations is weak in terms of the statement made by plaintiff that it would not have undertaken to sponsor the project but for the belief that the Government was assuming the role of absolute insurer. Surely the plaintiff cannot have supposed that the statute was designed to take every normal business risk out of the venture. The contractor must have been aware, also, of the inability of the Government, or any government, to guarantee that defense needs are immutable. For all these reasons the suggestion that the defendant must be held liable on some sort of theory of equitable estoppel is also untenable.

In the absence of any representations conferring contractual guarantees against the impermanency of Henry Barracks and because of the clear intent of the Wherry Act that no such guarantees would be made, we hold that the plaintiff has established no right to recover either the capital it has invested or any possible profits.

The plaintiff's motion for summary judgment will be denied; defendant's cross motion for summary judgment will be granted. The petition will be dismissed.

It is so ordered.

JONES, Chief Judge, and LARAMORE, MADDEN and WHITAKER, Judges, concur.