**G. L. CHRISTIAN AND ASSOCIATES**

v.

**The UNITED STATES.**

No. 56–59.

United States Court of Claims.
July 12, 1963.

Gilbert A. Cuneo, Washington, D. C., for plaintiff. Norman R. Crozier, Jr., Dallas, Tex., Chester H. Johnson and O. D. Hite, San Antonio, Tex., Richard C. Bexten, Dallas, Tex., Chester E. Finn, Dayton, Ohio, William L. Hillyer, San Diego, Cal., William W. Sweet, Jr., Wilson Johnston, Dallas, Tex., and Cummings & Sellers, Washington, D. C., of counsel.

Carl Eardley, Washington, D. C., with whom was John W. Douglas, Asst. Atty. Gen., for defendant. Irving Jaffe, Washington, D. C., and Gerson B. Kramer, Silver Spring, Md., of counsel.

Before JONES, Chief Judge, and WHITAKER, LARAMORE, DURFEE and DAVIS, Judges.

DAVIS, Judge.

Plaintiff's motion for rehearing and reargument raises, for the most part, issues which were not previously presented and were therefore not discussed in the court's opinion handed down on January 11, 1963, 312 F.2d 418. The additional arguments all concern our refusal to award anticipated but unearned profits to the contractor and its subcontractors. We have considered these new contentions and have concluded that they require no change in our judgment or in the reasoning on which it is based.[1] This supplementary opinion treats mainly with the points which have not hitherto been explicitly considered.

1. We held in our original opinion that Section 8.703 of the Armed Services Procurement Regulations (ASPR) required, as a matter of law, the inclusion in plaintiff's housing contract of the standard-form military article providing for the termination of construction contracts for the convenience of the Government. The Supreme Court has made it plain that validly issued military procurement regulations have the full force and effect of federal law, even to the extent of overriding inconsistent state legislation. Paul v. United States, 371 U.S. 245, 255, 83 S.Ct. 426, 9 L.Ed.2d 292 (1963); Public Utilities Comm. of California v. United States, 355 U.S. 534, 542–543, 78 S.Ct. 446, 2 L.Ed.2d 470 (1958); Leslie Miller, Inc. v. Arkansas, 352 U.S. 187, 77 S.Ct. 257, 1 L.Ed.2d 231 (1956). But plaintiff now says, for the first time, that this particular section of the ASPR was promulgated without statutory authority and accordingly is bereft of the force of law.[2] The chief reason advanced is that the Armed Services Procurement Act of 1947, 62 Stat. 21—the general military procurement statute—which was a principal legislative basis for Section 8.703, did not expressly refer to termination of military contracts. On this ground it is said that the Procurement Act wholly failed to cover the subject of contract-termination in any way, and that a new statute dealing specifically with such terminations would be necessary before the Defense Department (or its constituents) could issue binding regulations in that area. In support of this proposition, plaintiff cites the unsuccessful efforts which have been made to obtain such express legislation, as well as general statements by Defense Department officials and others which are interpreted as recognizing that

---

1. Similar contentions have recently been made, in brief and oral argument, in J. W. Bateson Company, Inc. v. United States, No. 365-60, also being decided today. We have taken account of those arguments.

2. In its original presentation, plaintiff did not challenge the validity of Section 8.703 as law, but only its applicability to plaintiff's contract. In accepting Commissioner White's recommended opinion, plaintiff acquiesced in his express ruling that Section 8.703, if applicable, was binding. Commissioner White was of the view that, though that section was binding, it was inapplicable to plaintiff's Capehart Act contract because it did not obligate appropriated funds.

the termination regulations set forth in ASPR are without statutory authority.

■■■ The basic defect in this argument is its failure to recognize that general legislation empowering, in broad terms, a government agency to procure and to make contracts normally covers all phases of that process—from the solicitation of bids or proposals, to the making of the contract, through its administration and performance, to its completion or termination. "The power to purchase on appropriate terms and conditions is, of course, inferred from every power to purchase." Priebe & Sons v. United States, 332 U.S. 407, 413, 68 S.Ct. 123, 127, 92 L.Ed. 32 (1947). Unless the Congress has prohibited the agency from entering some phase of the contractual process (or using some otherwise lawful method of contracting), a grant of wide and general authority to contract and procure will extend to all reasonable phases and methods. See Kern-Limerick, Inc. v. Scurlock, 347 U.S. 110, 114 ff., 74 S.Ct. 403, 98 L.Ed. 546 (1954); Public Utilities Comm. of California v. United States, 355 U.S. 534, 540–543, 78 S.Ct. 446, 2 L.Ed.2d 470 (1958); Paul v. United States, 371 U.S. 245, 251–255, 261–263, 83 S.Ct. 426, 9 L.Ed.2d 292 (1963); United States v. Penn Foundry & Mfg. Co., Inc., 337 U.S. 198, 214–216, 69 S.Ct. 1009, 93 L.Ed. 1308 (1949) (opinion of Mr. Justice Douglas). There is a cardinal illustration in the history of contract-termination-for-convenience itself. It was not until July 1, 1944, that Congress enacted the Contract Settlement Act of 1944, 58 Stat. 649, establishing legislative standards and procedures for the termination of World War II contracts for the Government's convenience.[3] But for over two years before that time the War and Navy Departments had been

using termination-for-convenience clauses in many of their contracts and had also been issuing regulations dealing with such provisions.[4] This was done principally under the generous umbrella of Title II of the First War Powers Act of December 18, 1941, 55 Stat. 838–839, authorizing the President to empower war agencies "to enter into contracts and into amendments or modifications of contracts heretofore or hereafter made * * *, without regard to the provisions of law relating to the making, performance, amendment, or modification of contracts whenever he deems such action would facilitate the prosecution of the war * * *." (Executive Order No. 9001, 3 C.F.R., 1943 Cum.Supp., pp. 1054–1056, delegated this authority to the war agencies, cf. 40 Op.Atty.Gen. 225 (1942)). See also ch. 508, 54 Stat. 712; ch. 340, 56 Stat. 314, 316–317. Though the First War Powers Act did not refer specifically to contract-termination, its general terms authorized those departments procuring for war ends to employ such contract articles—as well as many other provisions and forms not mentioned in the statute. The Contract Settlement Act was passed in 1944, not because the war agencies were then powerless to issue termination regulations or to insist on termination-for-convenience clauses, but because it was considered appropriate to establish uniform *Congressional* standards enforced by a central civilian agency, and thus to confine and supervise the broad discretion hitherto exercised by the separate departments and agencies under the First War Powers Act (as well as the authority which the Comptroller General threatened to exercise). In short, the Settlement Act was felt to be wise and desirable, but it was not needed to confer *power* in the area of contract-termination.

---

3. The Contract Settlement Act applied only to World War II contracts.

4. See Malman, Policies and Procedures for the Termination of War Contracts, 10 Law and Contemporary Problems 449 (1944); Goldman, Termination of War Department Contracts at the Option of the Government, 42 Mich.L.Rev. 733

(1944); Dounis and Forman, Historical Significance of Termination of Contracts for the Convenience of the Government, 14 Fed.Bar J. 191, 204–211 (1954); United States v. Penn Foundry & Mfg. Co., Inc., 337 U.S. 198, 214–216, 69 S. Ct. 1009, 93 L.Ed. 1308 (1949) (opinion of Mr. Justice Douglas).

■ With respect to this subject of contract-termination, the situation is the same under the Armed Services Procurement Act of 1947 (and its supplementing legislation) as it was under the First War Powers Act. The Procurement Act (now 10 U.S.C. §§ 2301 et seq.) is a broad charter conveying general authority to the service departments to enter into contracts by advertising, and in many circumstances into negotiated agreements. See H.Rep. No. 109, 80th Cong. 1st Sess., p. 6; S.Rep. No. 571, 80th Cong., 1st Sess., p. 2. It clearly covers contracts for buildings, facilities, and public works. Sec. 10 U.S.C. § 2303(b). Aside from specified requirements and prohibitions (not now pertinent), the Act leaves to the procuring agency the terms and conditions of both negotiated and advertised contracts. Many different types of agreements and contractual provisions can be, and have been, adopted under the sweeping authority accorded by the Act. In particular, the Act does not in any way prohibit or limit, expressly or by implication, the use of clauses providing for termination of a contract for the convenience of the Government. As in the period prior to the Contract Settlement Act of 1944, that subject is left to the discretion of the procuring agencies. Just as the comprehensive provisions of the First War Powers Act sanctioned the promulgation and use of termination clauses although termination was not mentioned in that statute, so the comprehensive terms of the Procurement Act authorized the promulgation of Section 8.703 of the ASPR. Buttressing the Procurement Act as the source of this provision are the general statutory sections authorizing the Defense and Service Secretaries to adopt directives and regulations in their fields of competence, including procurement. See Congress Construction Corp. v. United States, Ct. Cl. No. 535–59, decided March 6, 1963,

314 F.2d 527, 531 (Secretary of Defense); 10 U.S.C. § 3012 (Secretary of the Army); 10 U.S.C. § 8012 (Secretary of the Air Force); 5 U.S.C. § 22 (general authority to issue departmental regulations)[5]. The basic administrative authority of the military departments to adjust claims of the termination kind has, of course, long been established. Cannon Construction Company, Inc. v. United States, Ct.Cl., 319 F.2d 173.

When Section VIII of the ASPR (dealing with contract termination) was issued in 1952, the Defense Department declared that, while the Procurement Act does not specifically mention terminations, the new termination regulation was being issued "under the general authority of the Secretaries of the Military Departments, based on the Procurement Act and other statutes, to issue detailed regulations to carry out their authority and responsibilities." The authority thus invoked was adequate to sustain termination regulations of this type—though no doubt the legislative foundation could be strengthened and supplemented by more explicit Congressional action.

Plaintiff stresses the lack of detailed legislative policies on termination, but the absence of such Congressional spelling-out is very different from the absence of any authority in the administrators under their general procurement powers. The experience under the First War Powers Act, among others, shows that procurement administrators can properly act under broad and general authority until Congress sees fit to channel and guide their conduct more precisely. We do not read the Army and Navy textbooks on procurement or contract law, cited by plaintiff, as denying this general authority. As we understand them, they say only that—since no statute (like the Contract Settlement Act of 1944) specifically covers the field of termination, requires the inclusion of a

**5.** Both the Army and Air Force Departments adopted, in substance, the ASPR regulation on termination, including Section 8.703. Plaintiff's contract was with the Army; the J. W. Bateson Company, Inc. (see fn. 1, supra) dealt with the Air Force.

termination-for-convenience article, and prescribes termination procedures—the ASPR termination procedures must find their basis in a contractual termination article, which can be incorporated in the contract "by reference or otherwise." [6] Under Section 8.703, such an article was required to be included in plaintiff's contract and therefore it was incorporated "by reference or otherwise." In addition, as we point out below (see also our original opinion, 312 F.2d at 427), there are four explicit references in the housing contract and accompanying agreements to a "termination of the Housing Contract for the convenience of the Government." This, too, can be deemed an incorporation of the standard article "by reference."

In the light of the lack of legislative specificity, the continued interest in a special termination statute (akin to the Contract Settlement Act of 1944) can be readily seen as primarily rooted in a desire for (i) firmer and more specific Congressional guidance and sanction, (ii) greater uniformity in policies and procedures, and (iii) certain changes in existing administrative practices. This is the clear motivation of the Chamber of Commerce statement ("Why a Contract Settlement Law?") cited by plaintiff in its motion for rehearing—not the absence of any legislative authority for the current administrative regulations.

■■ 2. The Supreme Court's rulings in Paul, Public Utilities Commission of California, and Leslie Miller, Inc., cited supra, require that, once Section 8.703 of the ASPR is recognized as validly authorized, it must be accorded the full effect of federal law. We have already pointed out the statutory authority for this section (and the standard

article it requires) in the Procurement Act of 1947 and supplementing legislation. The history of contract-termination over the past decades (sketched in our original opinion) proves the propriety and reasonableness of the normal articles for a convenience-termination. Regulations reasonably adapted to the administration of a Congressional act, and not inconsistent with any statute, have "the force and effect of law." See, e. g., Maryland Casualty Co. v. United States, 251 U.S. 342, 349, 40 S.Ct. 155, 64 L.Ed. 297 (1920); United States v. Barnard, 255 F.2d 583, 589 (C.A. 10, 1958), cert. denied, 358 U.S. 919, 79 S. Ct. 287, 3 L.Ed.2d 238. It follows that, if Section 8.703 applied, it demanded the inclusion of the standard article in plaintiff's contract and that contract must be interpreted to comply (at least if it is to be held a valid agreement on which plaintiff can sue).

■■ Plaintiff admits that, if a statute requires the inclusion of a termination clause, such a provision would be read into the agreement, whether the negotiators put it there or not. But great objection is laid against the incorporation of an article into a new contract by means of a valid pre-existing regulation.[7] It is difficult to see why this should be so when, as the Supreme Court cases demonstrate, "mere" regulations can supersede state laws which would otherwise control; giving the regulations the status of law equates them fully to federal legislation. The concept of such incorporation is not novel. A well-known example is Executive Order No. 9001 (implementing the First War Powers Act), supra, which expressly required, without *specific* statutory foundation, that World War II contracts should contain a covenant-against-con-

---

6. The Army's textbook is Procurement Law (1961) p. 407; the Navy's is Navy. Contract Law (1959), § 5.29. The Air Force textbook (Air Force Procurement: Prices and Profits (1953), p. 113) is worded less carefully and seems to say (incorrectly, we believe) that Section 8.703 "has no statutory *warrant*" (emphasis added). It may be that the authors meant

no more than that there was no statute *requiring* such provisions.

7. We are concerned, of course, only with a regulation antedating the making of the contract. There is no question here of a unilateral attempt by the Government to modify a pre-existing agreement. That would raise wholly different problems.

tingent-fees, as well as an anti-discrimination clause. If the contracts were to be deemed valid, these articles had to be read as part of all war procurement agreements, whether or not they were physically incorporated. Conversely, the President forbade the cost-plus-a-percentage-of-cost system of contracting or the payment of fixed fee of more than 7% of estimated cost. No contract could transgress these requirements. See, also, Speck, Enforcement of Nondiscrimination Requirements for Government Contract Work, 63 Col.L.Rev. 243, esp. 248–49 (1963); Van Cleve, The Use of Federal Procurement To Achieve National Goals, 1961 Wis.L.Rev. 566. It was important then, and it is important now, that procurement policies set by higher authority not be avoided or evaded (deliberately or negligently) by lesser officials, or by a concert of contractor and contracting officer. To accept plaintiff's plea that a regulation is powerless to incorporate a provision into a new contract would be to hobble the very policies which the appointed rule-makers consider significant enough to call for a mandatory regulation. Obligatory Congressional enactments are held to govern federal contracts because there is a need to guard the dominant legislative policy against *ad hoc* encroachment or dispensation by the executive (see, e. g., United States v. Mississippi Valley Generating Co., 364 U.S. 520, 81 S.Ct. 294, 5 L.Ed.2d 268 (1961)). There is a comparable need to protect the significant policies of superior administrators from sapping by subordinates.

Like other individuals who deal with the Federal Government (see, e. g., Federal Crop Insurance Corp. v. Merrill, 332 U.S. 380, 68 S.Ct. 1, 92 L. Ed. 10 (1947)), potential contractors can validly be bound to discover the published directives telling them the limits and the scope of the agreements the Government can make. Our concern is not at all whether the policy of embodying mandatory contractual provisions in regulations is the best one. Our special interest is only the legality of such a practice, and we hold that, in the procurement field as in others, an authorized regulation can impose such peremptory requirements on federal officials and those who seek to enter into transactions with the Government.[8]

3. Plaintiff also contends that, in any event, the termination provisions of the ASPR do not, under their own terms, control the contract at bar because none of the termination regulations apply except where (a) the agreement already contains a termination article, and (b) the contract is made under the Procurement Act (and not under the Capehart Act). We find neither contention to be sound.

(*a*). Plaintiff founds its argument, that Section 8.703 (requiring the standard termination-for-convenience article for *construction contracts* of the size of plaintiff's) concerns only contracts *already* containing such an article, on Section 8.101 of·the ASPR which declares that the termination *part* of the Procurement Regulations (Section VIII) "applies to contracts entered into under the [Procurement] Act which by their terms provide for termination thereof for the convenience of the Government", and also that contracts not containing such a clause (or a clause differing from the standard clauses) "may be amended to include or substitute a standard clause." But these portions of Section 8.101 do not have the meaning plaintiff attributes to them. By its very wording, the impact of Section 8.703, expressly directing that a certain standard clause "*shall* be inserted" (emphasis added) in construction contracts,[9] could

8. For an early example of a regulation governing the making and content of contracts, see Whiteside v. United States, 93 U.S. 247, 23 L.Ed. 882 (1876).

9. See also Section 8.102, promulgated February 29, 1952, directing that "the appropriate Standard Termination Clause" set forth in the termination regulations "shall be inserted, to the extent prescribed" in the regulations "in contracts executed as of a date on or after March 1, 1952 * * *."

not and does not depend upon the *pre-existence* of such a clause in the contract. Rather, the clue to Section 8.101 is that Section VIII, the termination portion of the Procurement Regulations, contains an elaborate set of *procedures and practices* to be followed upon the termination of a contract. The purpose of Section 8.101, referring as it does to "this *part*" (i. e., the whole termination regulation), is to make these *procedures and prac-tices* (which are not embodied directly in any contract, or required to be so embodied) applicable to contracts which contain, either expressly or by incorporation, a termination-for-convenience clause—and only to such contracts. Not all contracts were (or are) required to have such a clause; and if the clause were not required to be included in an agreement the procedures and practices of Section VIII of the Procurement Regulations would not control, even if the Government should thereafter elect to terminate the contract for its own convenience.

The sentence in Section 8.101 saying that contracts without any of the new standard termination clauses can be amended to include one.—on which plaintiff also relies—was obviously placed in the regulations to cover contracts already in existence before the issuance of the new termination regulation. Section VIII, the termination part of the ASPR, was promulgated in February 1952. Section 8.102 (footnote 9, supra), as well as Section 8.703, ordered the new standard-form termination clauses to be used in the appropriate future contracts. One of the purposes of Section 8.101 was to afford the Government and a contractor the right to conform already-existing contracts to the new standards, by agreement, if they wished to do so. The section did not controvert the mandatory requirement to Section 8.703 (and its kin) that future contracts were to include the new article.[10]

(*b*). Another of plaintiff's arguments is that the termination regulation applied, by its own terms, only to contracts under the Procurement Act of 1947, and plaintiff's contract was not made under that statute but under the Capehart Act. It is true that the housing contract referred specifically only to the Capehart Act, which was the explicit authority for the Government to undertake the elaborate tri-partite arrangement under which Capehart Act housing was erected and maintained—including the leasing of land to the private party, the insuring of the loan, the payment of the mortgage indebtedness by the Government, and the operation of the housing project. But the housing contract itself was primarily a construction contract, and the general provisions of the Procurement Act authorized the armed services to make construction contracts of various types; since its enactment that Act has been the main basis upon which military construction contracts have been founded. Special legislation may provide additional authority or limitations for certain projects or kinds of agreements, but that supplemental authority does not eliminate the general grant given to the military departments by the 1947 statute. Plaintiff's housing contract was grounded in part upon the special implementing provisions of the Capehart Act but, as a construction contract, it also drew basic authority from the Procurement Act.[11] The former statute expressly requires that construction contracts for the housing projects shall be made by competitive bidding as provided in the Procurement Act (42 U.S.C. § 1594(a)). The failure of the contract to mention the latter is no more signifi-

---

10. The military textbooks and materials plaintiff cites, as supporting its position, are in accord with Section 8.101 as we have explained it. The textbooks make it plain that the "whole termination system established by ASPR Section VIII"—i. e., the detailed procedures and practices— are not themselves incorporated directly into the contract but become applicable through the standard termination article.

11. Section 1.101 of ASPR provided that the Procurement Regulations apply generally to procurement of supplies and services under the Procurement Act or under other statutory authorization.

cant than if some other construction contract had referred only to the appropriation legislation granting the money for the buildings or the act authorizing a new military base on which the buildings were to be erected; the general authority of the Procurement Act would nevertheless be involved.

4. Plaintiff's next point is that, even if Section 8.703 would otherwise apply, there was sufficient administrative authorization to omit the standard termination article from Capehart Act housing contracts. The essence of this contention is that a special form of contract was drawn up by the Defense Department and the Federal Housing Administration for Capehart Act projects, differing in many of its articles from the standard forms and leaving out a termination-for-convenience clause. Undoubtedly, the Secretary of Defense—who had general supervisory authority over the Procurement Regulations, as well as a specific grant of power under the Capehart Act to include in the housing contract such terms and conditions as he considered necessary—could have decided that Capehart Act construction contracts, unlike other military construction agreements, should not be terminated for the Government's convenience without rendering the United States liable for anticipated but unearned profits. The question is whether it has been shown that he (or a proper delegate) did make that choice. We think not.

(a). The Armed Services Procurement Regulations contemplated a specific mechanism for receiving permission to deviate from required forms or articles. See 32 C.F.R. 400.108 (1954 rev.) and 32 C.F.R. 1.109 (1955 rev.). There is no proof, or offer to prove, that this mechanism was used. It is said, however, that the general agreement of the Assistant Secretary of Defense (Properties and Installations) with the Federal Housing Commissioner upon a number of forms, including a form of housing contract, constituted sufficient permission to eliminate the termination-for-convenience clause. Here, too, there is lacking any proof that this particular Assistant Secretary was empowered to approve alterations in articles mandatorily required by the ASPR. More importantly, we are not persuaded that a conscious decision was made, at the appropriate level in the Defense Department, to eliminate the required termination article and thus to subject the Government to the full common-law measures of damages (including unearned profits). We are informed by plaintiff (as well as by the plaintiff in J. W. Bateson Company, Inc. v. United States, Ct. Cl., No. 365–60) that there was no discussion—either between the contractors and the Government, or while the form of housing contract was being drawn up by the Government officials—as to the inclusion or omission of the standard-form article. There is therefore no direct showing of such a conscious election to omit the termination provision.[12]

(b). Plaintiff insists that such an affirmative decision as to termination must nevertheless be implied from (i) the use in the housing contract of *other* standard articles, coupled with the omission of the termination-for-convenience clause, and (ii) an understanding with Congress, reflected in the Capehart Act, that the projects would not be cancelled. The

12. Plaintiff has filed an affidavit by one of the subordinate officials in the Federal Housing Administration, who participated in 1955 and 1956, together with other F.H.A. officials and Department of Defense representatives, in drafting the general form of Capehart Act housing contract, saying (in addition to the fact that none of the participants mentioned the standard article) that "no one ever considered that a Capehart project would ever be cancelled" and summarily suggesting that there was an unstated understanding to this effect. General "testimony" of this type, even if given at a trial, would plainly be inadmissible; in any case, such imprecise and conclusory generalities are wholly inadequate to sustain a finding that the proper Army or Defense Department officers affirmatively dispensed with the regulatory requirement of the standard termination clause.

fact that the housing contract employed variations of the standard clause for "disputes", "changes", etc.—to accommodate the role of the F.H.A. in the administration of the contract, and to cover other special circumstances of Capehart Act projects—does not mean that the uniform termination clause was deliberately rejected by officials in the Defense Department empowered to make that choice. The matter may never have been brought to their attention, or, if it were, they may have thought that the four explicit references in the contract (and its accompanying agreements) to "termination for convenience" of the Government adequately incorporated the standard article on that subject.

Plaintiff also errs in thinking that projects under the Capehart Act were never to be cancelled. The Act required (70 Stat. 1018–1019) the Secretary of Defense to submit to Congress a report "stating the intent to construct or acquire such [housing] units," and "certifying that the number of units to be constructed or acquired is consistent with the long range troop strength to be stationed at the location of such unit." This is a certification of present understanding and present intent. It is a far cry from a guaranty that the project would not be cancelled, no matter what unforeseen changes in military requirements might occur. The predecessor Wherry Act contained a comparable certification requirement, but this court held that nothing equivalent to a guaranty was intended and that "Congress must have been aware that the requirement for a fluid military establishment made it impossible to represent that a military installation would not be deactivated or curtailed for the indefinite future." Henry Barracks Housing Corp. v. United States, 281 F.2d 196, 200, 150 Ct.Cl. 689, 695 (1960). As under the Wherry Act, a Capehart Act contractor must have been aware "of the inability of the Government, or any government, to guarantee that defense needs are immutable" (281 F.2d at 202, 150 Ct.Cl. at 699).

(c). In addition to the absence of a persuasive showing that a proper Defense Department officer chose to waive the requirement for a convenience-termination clause, there is affirmative evidence that no such election was made. We pointed out in our original opinion (312 F.2d at 427), and mention above, that there are four express references to termination-for-convenience in the contractual papers. The housing contract itself twice mentions "termination of the Housing Contract for the convenience of the Department prior to completion of the project"; the accompanying building loan agreement provides for certain action "if the Housing Contract shall be completely terminated for the convenience of the Department prior to completion of the project"; and the companion guaranty-with-respect-to-mortgage-payments refers to "the complete termination of the Housing Contract for the convenience of the Department prior to completion of the F.H.A. project."

Plaintiff minimizes these explicit references as included solely to satisfy private lenders who were afraid that the Government might cancel the housing contract even though there was no authority to do so. It is difficult to accept this as the correct explanation for the reiterated inclusion of these phrases. One of the citations in the housing contract deals not only with the lender but with the plaintiff itself. The other three references directly concern only the lender, but they limit the Government's liability to that party to the monies advanced up to the date of termination and waive other claims. If plaintiff were right, such termination by the Government would constitute an outright breach and the lender might be entitled to unearned interest, just as the plaintiff-builder would be entitled to unearned profits; the lenders would have been better off not to press for the "protection" plaintiff says they sought. Moreover, if plaintiff were right, there would be no need for these special references to termination since the normal law of contracts would give the lenders all neces-

sary protection against the injurious consequences of a breach by the Government.[13]

 Above all, we cannot believe the familiar and established phrase "termination for the convenience of the Department" meant, in this contract, a cancellation which would be a breach of contract. At least since the early days of World War II (if not earlier), the concept of "termination for convenience" has been well understood as a termination authorized by the contract which would *not* be a breach. See, e. g., United States v. Penn Foundry & Mfg. Co., Inc., 337 U.S. 198, 214–216, 69 S.Ct. 1009, 93 L.Ed. 1308 (1949) (opinion of Mr. Justice Douglas). That term is not normally used, if it is ever used, in Government contractual documents to refer to a cancellation by the United States which violates the agreement. If such a breach-cancellation were meant, the parties would have used other words such as "cancellation", "breach", "stoppage", "default", or perhaps "termination" unqualified by any reference to the convenience of the Department or the Government. They did not do so and we are justified in reading the precise words they employed as referring to a termination authorized by the housing contract, not in breach of it. When the Government terminated the contract, it acted as if it had that right; it informed the contractor that the agreement "is hereby terminated for the convenience of the Govt."

(*d*). In sum, we hold that plaintiff has failed to show that the mandatory requirement of Section 8.703 was deliberately waived by a military official empowered to do so. The plaintiff and other Capehart Act contractors may have thought that there could be no termination of these housing contracts for the

Government's convenience, and some Government personnel may have had the same view—although the specific contractual references should have been warning to both groups. But that misunderstanding cannot substitute for a valid, deliberate, authorization to by-pass the regulation. As suggested in our original opinion, the general policy against subjecting the Government to liability for unearned profits on military contracts is strong and important. For military construction contracts, that policy was embodied in Section 8.703. If we were to find that the competent administrators dispensed with that significant requirement for this particular group of construction contracts, we would need to have a far more definitive showing than has been made here (or in J. W. Bateson Company, Inc. v. United States, No. 365–60).

5. On the issue of whether plaintiff's contract "obligated appropriated funds" under the ASPR, discussed at some length in our prior opinion, we add only one comment. The two cases cited in the rehearing motion (Continental Casualty Co. v. United States for Use and Benefit of Robertson Lumber Co., 305 F.2d 794 (C.A.8, 1962), cert. denied, 371 U.S. 922, 83 S.Ct. 290, 9 L.Ed.2d 231; United States for Use and Benefit of Miles Lumber Co. v. Harrison & Grimshaw Const. Co., 305 F.2d 363 (C.A.10, 1962), cert. denied, 371 U.S. 920, 83 S.Ct. 287, 9 L. Ed.2d 229) are not opposed, in theory or holding, to our ruling in the original opinion. The sole question in those cases was whether, in a Capehart Act project, the notice required under Miller Act bonds (40 U.S.C. § 270a) was sufficient for a suit against the surety, or whether the special notice imposed by the Capehart Act bonds was required. The courts held that the special Capehart Act requirements had to be followed. The

---

13. Plaintiff also says that the lenders were afraid that the Government and the builder might *later* agree to insert a termination-for-convenience provision. This, too, seems farfetched as the explanation of the four express and straightforward references—saying nothing of a later amendment but phrased as if a present right to terminate existed—especially since the lenders would undoubtedly be safeguarded by their participation, or by the law, in the event of a change in the housing contract which was material to their interests.

issue in those cases was quite different from that before this court and the pertinent considerations dissimilar. With respect to the subject of appropriated funds, both circuits said no more than that private funds are initially used in Capehart Act projects, the use of appropriated funds coming later. We agree, of course, with that statement, but for the reasons given in our earlier opinion it does not determine whether the housing contract "obligated appropriated funds" within the meaning of the Armed Services Procurement Regulations.

Plaintiff's motion for rehearing and reargument is denied.