**A. M. GROSS et al., d/b/a Almond Acres Housing Project**

v.

**The UNITED STATES.**

**No. 247–55.**

United States Court of Claims.

March 18, 1966.

Byron N. Scott, Washington, D. C., attorney of record, for plaintiffs.

Edward Friedlander, Washington, D. C., with whom was Asst. Atty. Gen. John W. Douglas, for defendant.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS and COLLINS, Judges.

DURFEE, Judge.

A war-caused housing shortage, an enterprising promoter, risky investment, and a sudden housing surplus, woven together to form a $325,000 business loss, constitute the major elements leading up to this suit for breach of an implied contract.[1] There is no doubt that the loss occurred; the sole question before the court pertains to defendant's liability.

The story of this controversy began on August 9, 1950, shortly after the outbreak of the Korean War. On that date the Department of the Army reactivated Camp Roberts, California, a former World War II Army training camp located near San Miguel. Shortly after the reopening, the Army moved in a large number of troops for training and subsequent trans-shipment to the Korean theater. As a result of the large influx

---

1. Plaintiffs' petition charged defendant with breach through misrepresentation. As a result of adverse findings on this point, however, plaintiffs have apparently abandoned the misrepresentation claim and shifted to the implied contract theory.

of troops there soon developed a critical shortage of housing for military personnel and their dependents in the nearby vicinity. Housing was especially needed for the permanent cadre of instructors. Camp Roberts was designated as a temporary military installation, and thus was ineligible for assistance in home construction under the Wherry Housing Act.[2] The housing shortage continued during the remainder of 1950 and through 1951. Housing conditions for the troops and their dependents were very bad with every available kind of structure being used for rental housing, and all of it being subject to extremely high rentals.

Sometime in mid-1951 a Mr. Burt B. Mold became acquainted with the critical housing shortage, and became interested in furnishing housing for troops in the Camp Roberts area as a private enterprise matter. In this connection, Mr. Mold organized a firm to be known as Edward Biaggini & Associates. The firm, financed by local investors, was to develop a housing project for the Camp Roberts area. Sometime in July of 1951, Mr. Mold learned of the existence of 976 Government-owned temporary portable housing units located at Wilmington, California. The units were prefabricated one and two-bedroom homes which were vacant under an order of the Housing and Home Finance Agency (HHFA) which suspended all sales or disposition of portable family dwelling units and other housing owned by the United States, pending a determination of their need for defense purposes during the Korean War.

Upon learning of the suspense or "freeze" order on these portable dwelling units, Mold began a campaign to obtain the release of the houses for sale to private enterprise for use at Camp Roberts. The Commanding Officer of Camp Roberts was contacted, and letters were writ-

ten by Mold to the President of the United States, the Secretary of the Army, officials of the Public Housing Administration (PHA), HHFA, and senators and congressmen from California. As a result of Mold's urgent and vigorous activities, the HHFA and the PHA decided in December, 1951, that 500 of the units would be released for sale, and that the PHA would place the units on sale to the highest bidder, subject to removing the units and relocating them in the vicinity of Camp Roberts and making said units available for rental to personnel of the camp. A press notice to this effect was released on January 14, 1952.

The invitation for bids was then prepared. Pertinent parts of the invitation provided that the sale was "as is" and "where is"; that the property was to be removed at the purchaser's expense; that PHA made no warranties either express or implied with respect to the property, except a warranty of title; that the houses were to be moved near to Camp Roberts, and were to be made available for a period of five years for rental to the camp personnel, unless the Commanding Officer determined the need for housing no longer existed; that the purchaser covenanted he had a site available for the relocation of the units.[3]

Thereafter, a bid was submitted by Amercal Corporation, successor in interest to the Mold group,[4] and by two other groups. All bids were rejected by PHA. In the meantime, Mold had interested another group of investors in the venture. Mr. Harvey Silbert, an attorney, was spokesman for the new group. Mold acquainted Silbert with the Camp Roberts situation, but never showed Silbert any tangible evidence that would indicate Camp Roberts was a permanent installation. Mold, in fact, apparently never believed Camp Roberts to be anything other than a temporary

**2.** 63 Stat. 570 (1949), 12 U.S.C. §§ 1702, 1706, 1715c, 1716, 1748–1748g (1964 ed.)

**3.** Mold had completed negotiations for 21 acres of land near San Miguel, California in August, 1951.

**4.** Findings 19, 20 and 21 contain the detailed facts of the changeover in investment groups.

camp, as evidenced by the aforesaid earlier letters from Mold to the President and the California congressmen and senators. Those letters in part had stated:

Most construction companies refuse to build because of the risk involved in the construction of temporary housing. I have heard many construction executives state that they would build permanent housing if they were assured that Camp Roberts would bebecome a permanent fort. That, of course, is far-fetched and questionable, although making Camp Roberts a permanent fort would be a move in the right direction. Everyone out here agrees to that.

In any event, however, Silbert did not evidence any substantial concern with the length of active occupancy of the camp and decided to go forward with the venture.

At a meeting in April, 1952 in the office of the Regional Director of PHA, Mold and Silbert agreed to purchase one-half of the 500 units for $112,000 with an option on the remaining one-half. At the meeting there was no representative of the Department of the Army present, and throughout the meeting there was no discussion as to the length of occupancy of Camp Roberts. Nor did Silbert make any inquiries as to the permanency of the camp. Thereafter, drafting of the formal contract was turned over to the Chief Legal Officer of the Regional Office of PHA. The formal contract, as signed by Silbert on May 15, 1952 for the present plaintiffs,[5] contained the following crucial clause:

(7) The Purchaser shall, not later than 200 calendar days, [sic] from the date the Purchaser receives title to the Property from the Seller, transport the Property and make all of the said 250 dwelling units ready and available for rental on the site described in paragraph 6 hereof. The Purchaser shall make said 250 units available for rental for a period of five years to the military and civilian personnel of Camp Roberts. In the event that during the aforesaid five-year period (which shall be construed to commence on the date on which all of the 250 dwelling units are made available for occupancy) the Commanding Officer of Camp Roberts determines that a need for any number of such housing units no longer exits, the requirements of this paragraph will not apply to any dwelling units in excess of the number determined to be needed by a written finding of the Commanding Officer. Subject to the provisions of the preceding sentence, when any vacancy occurs after a dwelling unit has been occupied by military or civilian personnel of Camp Roberts, the Purchaser will hold such dwelling unit for the exclusive use of the military and civilian personnel of Camp Roberts for a period of 30 calendar days.

Also included was a disclaimer of warranty clause which stated:

(1) The Property is sold "as is" and "where is." The Seller makes no warranty, either express or implied, with respect to the Property except the Seller warrants it has the right to transfer title to the Property. The Seller's liability under this paragraph shall not exceed the amount of the purchase price.

Following execution of the contract, the contractor commenced moving 250 houses from Wilmington, California to San Miguel, California. The first of the houses arrived at San Miguel on May 29, 1952, having been moved on truck beds without being disassembled. By August 20, 1952, 204 of the houses had been relocated at the Camp Roberts area. The houses were repaired, and generally rehabilitated and shortly thereafter were opened for occupancy.

Sometime after execution of the contract, and prior to October 22, 1952, the

---

5. Silbert's investment group had by that time apparently taken control of the Amercal Corporation. Amercal Corporation subsequently dissolved in December, 1952 with the stockholders, the present plaintiffs, continuing to operate the venture as a partnership, Almond Acres Housing Project.

time for exercising the option on the second group of houses, Silbert and two of the large investors in the project visited Camp Roberts to ascertain the continued need for housing at the camp. Everyone concerned with the transaction at this point knew the camp had been used during World War II, and thereafter placed in a standby or inactive status. They also knew that the action in Korea was the cause of reactivation. In the opinion of a camp colonel, however, the investment seemed a sound one. Silbert understood this statement to be mere opinion. The other two large investors believed that no one could tell how long the post might stay open, and that this information could not be ascertained because it depended on the length of the Korean War. It should be noted that no representative of the Contracting Officer was present during this visit, and at no time did any representative of the Contracting Officer make *or was asked to make* any representation as to the permanence of the camp. The option to purchase the second group of houses was thereafter exercised; and the houses were moved on April 1, 1953.

The obvious conclusion to the aforesaid transaction needs little elaboration. Camp Roberts was deactivated shortly thereafter (November, 1953). With the inactivation of Camp Roberts, the source of tenants vanished for the 500 houses which plaintiffs had moved and rehabilitated for occupancy by military personnel. As a result, plaintiffs' losses amounted to at least $325,667.76. Plaintiffs now seek to recover these losses.

Plaintiffs have conjectured an implied contract theory as a basis for their recovery. In support of this theory, plaintiffs place much emphasis on the case of Padbloc Company, Inc. v. United States, 161 Ct.Cl. 369 (1963). The court in *Padbloc*, supra, using contemporary rules of contract law, viewed the totality of a factual situation and found an agreement by implied promise which formed the basis of a contract. The result was reached by snipping the superficial bonds of a unilateral offer contention by

defendant, and delving into the actual intricacies of the parties' obligations as evidenced by their actions and supporting documents.

Plaintiffs believe that here, as in *Padbloc*, supra, an implied promise on the part of defendant exists and has been violated. The gist of the contention is that, coupled with the execution of the original contract and the option, which acted to guarantee housing at Camp Roberts for a five-year period, was a reciprocal obligation on defendant's part to maintain Camp Roberts in active status for the five-year period. This contention stems from plaintiffs' thesis that it would be inconceivable that plaintiffs, businessmen interested in realizing a profit on their investment, would have committed themselves to the large outlay of cash or have entered into the project at all, if they had thought the Government had not guaranteed use of the housing for the five-year period.

Looking back on the previously stated facts, we find it difficult to put much credence in plaintiffs' allegations of implied contract. The original bid invitation gives us the first indication that such a promise on defendant's part did not exist. The invitation contained a specific disclaimer that no warranties were made with respect to the property. Further, specific mention was made of plaintiffs' obligation to make the houses available for a five-year period, yet no mention was made of any obligation by defendant to keep the camp operable for five years. Quite to the contrary, the plain, clear language of the invitation gave the Commanding Officer of the camp the right to make a determination at any time that the housing was no longer needed. This language flies in the face of plaintiffs' argument. While it is true that the contract was not awarded on the basis of the invitation, and also that most of the present plaintiffs were not involved in this venture at the time of the invitation, the original promoter, Mr. Mold, one of the present plaintiffs, and one of the negotiators for

all present plaintiffs had clear knowledge of the invitation.

■ Even if Mold's knowledge of the contents of the bid could not be imputed to all of the present plaintiffs, Clauses 1 and 7, supra, of the negotiated contract are binding on them. These clauses contain the same restrictions and obligations of the just-mentioned invitation, i. e., a specific disclaimer of any warranty express or implied, and a right of the Commanding Officer to determine at any time during the five-year period that the need for the housing no longer existed.[6]

Further proof, if needed, that neither party recognized any promise by defendant, can be shown by Mold's letter to the President, and California senators and congressmen in regard to the permanency of the camp, in which Mold termed such permanency "farfetched and questionable." Also, no inquiries were made by Silbert and Mold at the time of the negotiation as to the permanency of the camp. Even when this question of permanency finally did arise at the time of the exercise of the option for the 250 additional units, the investors never asked the Contracting Officer to make any representation as to the permanency of the camp. The investor plaintiffs realized that the ascertainment of permanency depended upon an unknown factor—the length of the Korean War.

Not only does plaintiffs' case fall on the facts, but the applicable case law—notably Henry Barracks Housing Corporation v. United States, 281 F.2d 196, 150 Ct.Cl. 689 (1960), is contrary to their position. Plaintiff in Henry Barracks, supra, was the operator of a Wherry Housing project. Shortly after construction of the project, the military post was deactivated. Plaintiff brought suit for breach of contract on the ground of express and implied promise that the camp would not be deactivated.[7] Plaintiff's position in Henry Barracks was stronger than the present plaintiffs', for in Henry Barracks, the Secretary of the Army had issued a certificate of need to FHA which stated in part, "there is no present intention to substantially curtail the activities at such installation." Nevertheless, the court found that such a certificate was neither a warranty nor guarantee, and that no breach occurred. The court stated, 281 F.2d at p. 200, 150 Ct.Cl. at p. 695:

* * * No responsible representative of the Defense Department could intelligently have said that an installation *was* permanent and that the activities *would not* be curtailed. Such assurances simply could not be given. * * *

and later, 281 F.2d at p. 202, 150 Ct.Cl. at p. 699:

* * * The contractor must have been aware, also, of the inability of the Government, or any government, to guarantee that defense needs are immutable. * * *

Here, as in Henry Barracks, the exigencies of a flexible defense policy precluded the possibility of any Government-made promises that the defense installation would be kept open a certain period of time. Such promises just could not be given.

The investors in this suit entered into these transactions with the objective in view of obtaining a return on their investment. After the erection of the houses at Camp Roberts, the unknown factor bearing upon the possibility of a profit to plaintiffs was the length of the Korean War. This was a risk of investment which plaintiffs accepted after careful consideration of the factors involved. Plaintiffs are not entitled to recover. The petition is dismissed.

---

6. Such a determination naturally could not have been made at the mere caprice of the Commanding Officer. The determination would have to have been a good faith one, based on need.

7. Plaintiff in Henry Barracks also alleged a misrepresentation by defendant.