WOODS PSYCHIATRIC INSTITUTE

v.

The UNITED STATES.

No. 23–89C.

United States Claims Court.

April 26, 1990.

* Editor's note: An earlier opinion published at 18 Cl.Ct. 394, is corrected by the court by this errata notice.

326

Patric Hooper, Los Angeles, Cal., atty. of record, for plaintiff.

Richard P. Nockett, Washington, D.C., with whom was Asst. Atty. Gen. Stuart M. Gerson, for defendant; Roberta R. Herrick, CHAMPUS, Dept. of Defense, of counsel.

## OPINION

YOCK, Judge.

This health care provider case is before the Court on the parties' cross-motions for summary judgment. Oral argument was held on April 19, 1990. For the reasons stated herein, the plaintiff's motion is denied, the Government's motion is granted,

and the plaintiff's complaint will be dismissed.

*Factual and Procedural Background*

Plaintiff, Woods Psychiatric Institute of Abilene, Texas, is seeking review of the final decision by the Director of the Civilian Health and Medical Program for the Uniformed Services (CHAMPUS), a federal health care program for dependents of members and former members of the uniformed services. CHAMPUS was established pursuant to the Dependents' Medical Care Act, Pub.L. No. 84–569, 70 Stat. 250 (1956) (codified as amended at 10 U.S.C. §§ 1071 *et seq.* (1988)), and is administered by the Secretary of Defense. 10 U.S.C. § 1073. The Secretary has delegated that responsibility to the Assistant Secretary of Defense for Health Affairs, who has, in turn, delegated the day-to-day administration of the program to the Director of the Office of CHAMPUS. 32 C.F.R. §§ 199.-5(c)–(d), 199.7(c)(2)(iii) (1985).[1]

Under the CHAMPUS health program, the beneficiary or sponsor[2] must share with the Government the cost of the covered health care services provided by the civilian facilities. 10 U.S.C. §§ 1079(b), 1086(b). For dependents or spouses of active duty members receiving inpatient care provided by a hospital or other authorized institutional provider, the beneficiary/sponsor is required to pay $25 for each admission or the amount the patient would have been charged had the care been obtained in a hospital of the uniformed services, whichever is greater. 10 U.S.C. § 1079(b)(1); 32 C.F.R. § 199.10(f)(2)(ii). For all other CHAMPUS beneficiaries/sponsors (retirees and/or dependents of retirees, deceased active members, and deceased retirees), the liability for covered inpatient care provided by a hospital or other authorized provider is 25 percent of the reasonable charges. 10 U.S.C. § 1086(b)(3); 32 C.F.R. § 199.10(f)(3)(ii). Furthermore, the regulations provide that if the health care provider should waive or forgive any beneficiary liability, then the CHAMPUS share of the charge shall be reduced by the same amount.[3] 32 C.F.R. § 199.10(f)(5).

In 1976, Woods Psychiatric Institute, then known as the Abilene Youth Center, entered into a Participation Agreement with CHAMPUS, authorizing it to provide health services to CHAMPUS beneficiaries as a residential treatment center (RTC).[4] In addition to signing a Participation Agreement, an authorized RTC must be accredited by the Joint Commission on Accreditation of Hospitals under the Commission Standards for Psychiatric Facilities Serving Children and Adolescents; comply

---

1. Comprehensive regulations implementing the CHAMPUS program were published in 1977 and have been codified at 32 C.F.R. Part 199 since that time. *See* 42 Fed.Reg. 17,972 (1977). The regulations have remained in the same format since the initial publication in 1977 until 1986, when they were republished in a revised and renumbered format. *See* 51 Fed.Reg. 24,008 (1986). The parties have agreed to and relied on (and cited) the 1985 edition of the Code of Federal Regulations, which contains the pertinent regulations that were in effect during the relevant period of this case. Thus, all regulations cited herein are 1985 regulations unless otherwise indicated.

2. Sponsor is defined in the regulations as the "active duty member, retiree, or deceased active duty member or retiree, of a Uniformed Service upon whose status his or her dependents' eligibility for CHAMPUS is based." 32 C.F.R. § 199.8(b).

3. An example of how this would operate is if the health care provider charged $100 per day and waived the full 25 percent owed by the beneficiary/sponsor, then the CHAMPUS share would only be 75 percent of the difference between the daily charge and the waived amount, *i.e.,* 75 percent of $75.

4. Residential treatment centers are defined as "a facility or distinct part of a facility that provides, to children and adolescents, a total, twenty-four hour, therapeutically planned group living and learning situation where distinct and individualized psychotherapeutic interventions can take place. A residential treatment center is organized and professionally staffed to provide residential treatment of mental disorders to children and adolescents who have sufficient intellectual potential to respond to active treatment (that is, for whom it can reasonably be assumed that treatment of the mental disorder will result in an improved ability to function outside the residential treatment center), for whom out-patient treatment is not appropriate, and for whom a protected and structured environment is medically or psychologically necessary." 32 C.F.R. § 199.12(b)(4)(v).

with the Standards for Residential Child Care, developed by the Interstate Consortium on Residential Child Care; and comply with the CHAMPUS Standards for Residential Treatment Centers Serving Children and Adolescents with Mental Disorders.[5] 32 C.F.R. § 199.12(b)(4)(v)(a).

The Participation Agreement provided that the plaintiff's charges to CHAMPUS beneficiaries would not exceed the charges for the same services provided at the most favorable rate to any other patient, agency, or organization. Further, the terms of the agreement specifically stated that CHAMPUS could terminate such agreement, after giving thirty days' notice, if the provider was not complying with the terms of the agreement, the requirements contained in the Dependents' Medical Care Act, as amended, or the implementing regulations.

Covered services for the treatment of mental disorders by RTCs include the following: individual, group, or family psychotherapy; psychoanalysis; psychological testing and assessment; administration of psychotropic drugs; electroconvulsive treatment; and collateral visits that are medically or psychologically necessary for treatment. 32 C.F.R. § 199.10(c)(3)(ix)(a)(1)–(8). In addition to these services, the regulations state that such other services and supplies provided by RTCs as room and board, patient assessment, diagnostic services, psychological evaluation tests, and other necessary medical care are also within the scope of the program benefits. 32 C.F.R. § 199.10(b)(4)(i)–(vi).

Services and supplies that are related to providing either regular or special education are not, however, covered benefits. 32 C.F.R. § 199.10(b)(1)(iv). This exclusion applies whether a separate charge is made for this service or whether the charge is included as part of the overall combined daily charge of the institution. This limitation is, likewise, found in the CHAMPUS Standards for Psychiatric RTCs, which specify that the RTC shall assume the responsibility for arranging or providing an educational program appropriate for the individual needs of the patients using community educational resources, its own resources, or some combination thereof. 32 C.F.R. Part 199, App. A(b)(8). The sole exception to this restriction is when the appropriate education is not available from or payable by the cognizant public entity, and even then, the specific situation must be referred to the CHAMPUS Director for review and determination of the applicability of CHAMPUS benefits. 32 C.F.R. § 199.10(b)(1)(iv). *See also* 32 C.F.R. § 199.10(g)(44) (academic education or vocational training services and supplies are specifically excluded from the CHAMPUS Basic Program benefits unless the above exception applies).

Following an audit report submitted in 1979 by the Defense Audit Service that was based on 19 CHAMPUS-authorized providers of mental health care (including six RTCs, one of which was the plaintiff), CHAMPUS requested that the Department of Health and Human Services (HHS) Audit Agency conduct an audit of Woods Psychiatric Institute. Specifically, the Defense Audit Service discovered that health care providers were frequently "waiving" the beneficiaries' share of the charges and apparently setting their rates at such levels so as to recover all of their costs, plus a profit, from CHAMPUS without collecting from the beneficiaries.

HHS conducted an audit of the plaintiff for the period of January 1, 1979, through August 31, 1980, to "evaluate [Wood's] operation of the CHAMPUS program in the areas of reasonableness of bad debt expense, propriety of rate structure, propriety and reasonableness of selected operating costs, and controls utilized to insure that unallowable and duplicated costs are not charged to CHAMPUS." The results of the HHS audit revealed that Woods had waived beneficiary/sponsor fees totaling $191,383 at the time of admission without making any attempts to collect the co-pay-

---

**5.** The CHAMPUS Standards are fully set forth in Appendix A to the regulations found at 32 C.F.R. Part 199.

ment. By using this waiver procedure, CHAMPUS was overbilled since the submitted bills reflected that the sponsor was responsible for 25 percent of the total, when, in fact, it had been waived or forgiven. Thus, HHS concluded that CHAMPUS' share of the payment had not been reduced by the amount that had been waived, as provided in the regulations, thereby constituting an overpayment by CHAMPUS to the plaintiff.

Additionally, the HHS audit reported that $41,369, or 57.2 percent of the billings to the sponsors, had been written off as bad debts. As a consequence of the plaintiff having no formal procedures designed to secure payment of delinquent accounts, as well as the plaintiff's practice of including an amount in its daily rate to cover the estimated bad debts incurred by the sponsors, HHS construed the plaintiff's bad debt expense as an additional waiver of beneficiary liability, which, in turn, should have reduced CHAMPUS' liability. The auditors also concluded that $45,061 had been charged to CHAMPUS for routine educational costs, contrary to the regulations.

On October 6, 1983, CHAMPUS requested that HHS conduct a second audit of the plaintiff for the period of September 1, 1980, through December 31, 1983. The results of this subsequent audit disclosed that Woods had waived sponsor liability totaling $192,952, although such waivers were not indicated on the billings submitted to CHAMPUS so as to reduce CHAMPUS' share, and that $262,327, or 51 percent of the amount billed to sponsors, had been written off as bad debts. Moreover, the audit concluded that $45,921 for educational costs had been improperly included in Woods' billings to CHAMPUS and that Woods had received approximately $33,000 in duplicate payments from CHAMPUS.

Based on the findings from these two audits, on January 24, 1986, CHAMPUS issued its initial determination to Woods that it had been overpaid in the amount of $812,676 during the period of January 1, 1979, through December 31, 1983. The plaintiff was notified in this initial determi-

nation that unless payment in full was made within 30 days, this indebtedness would be recouped by offsets against future CHAMPUS claims filed by Woods, in accordance with the Federal Claims Collection Act, 31 U.S.C. §§ 3701 *et seq.* (1982 & Supp. V 1987). On March 20, 1986, Woods requested a formal review of the initial determination in accordance with 32 C.F.R. § 199.16(c); however, Woods did not seek review of the liability assessed against it for the duplicate payments in the amount of $33,663.

The CHAMPUS Office of Appeals and Hearings (OAH) issued its formal review determination on November 26, 1986, reducing the disputed overpayments from $779,013 (the balance after subtracting out the nondisputed duplicate payments of $33,663 from the initial determination of $812,676) to $379,233.25, which represented $288,251.25 received by Woods from waiving sponsor payments and $90,982.00 for improperly included educational costs. The reduction in the alleged overpayment was primarily attributable to the OAH's conclusion that the sponsor billings written off as bad debts did not constitute a waiver of liability as a matter of law.

After receipt of the formal review determination, Woods requested a hearing to contest the remaining amount of alleged overpayments, and the hearing was held on October 28, 1987. The hearing officer submitted her recommended decision to CHAMPUS on December 1, 1987, that the OAH's formal review determination be sustained as to the sum of $288,251.25, resulting from sponsor liability being waived, but that the amount of disallowed educational costs be reduced from $90,982.00 to $71,-260.97. CHAMPUS adopted the recommended decision and issued its final decision on January 5, 1989, setting forth CHAMPUS' right of recoupment in the total amount of $393,175.22 as follows:

1. $33,663.00 for duplicate payments made to Woods, which is undisputed;

2. $71,260.97 for disallowable educational expenses; and

3. $288,251.25 for overpayments resulting from Woods improperly waiving the beneficiary/sponsor liability.

All the alleged overpayments to the plaintiff have since been recouped by administrative offsets of funds that were subsequently due the plaintiff.

On January 17, 1989, plaintiff filed this action, alleging that the final decision of CHAMPUS is arbitrary, capricious, and contrary to law, and therefore must be set aside. Further, plaintiff is seeking the return of all funds recouped from it, representing the disallowed educational costs and the disallowances attributable to the waiver of sponsor liability, the sums recouped for interest and administrative costs, interest on all these funds, plus attorneys' fees.

Thereafter, plaintiff filed its motion for summary judgment based on three issues: (1) the waiver of beneficiary/sponsor liability; (2) the educational costs; and (3) the untimeliness of CHAMPUS' action in advising of the audit results. Specifically, as to the waiver issue, plaintiff contends that the final decision is inconsistent with the statute; the regulations describing the waiver procedures are procedurally invalid; the CHAMPUS policy in effect during the relevant period did not prohibit Woods' actions concerning waivers; and the final decision as to waiver liability is arbitrary and capricious.

Concerning the costs for education, plaintiff asserts again that the regulations are procedurally as well as substantively invalid and that the final decision disallowing these costs is arbitrary and capricious. Lastly, it is plaintiff's position that CHAMPUS' delay in furnishing it with the results of the first audit created substantial prejudice by depriving Woods of the opportunity to mitigate the overpayments and the opportunity to fully examine the auditors who conducted the first audit as they were no longer employed with the Government at the time of the hearing. Furthermore, according to the plaintiff, the six-year statute of limitations precludes the recoupment of funds since the January 24, 1986, initial determination is more than six years after the November 1979 Defense Audit Service Report to CHAMPUS.

The Government responded to the plaintiff's motion for summary judgment by filing its cross-motion for summary judgment, claiming that the regulations in question are valid, a reasonable interpretation of the statute, and entitled to substantial deference. Further, the Government maintains that there was no CHAMPUS policy permitting the waiver of sponsor liability and that the statute of limitations does not bar recoupment of the overpayments.

*Discussion*

I. Standard of Review

Jurisdiction is properly exerted over the plaintiff's claim in the United States Claims Court pursuant to 28 U.S.C. § 1491(a)(1) (1982 & Supp. V 1987), which vests jurisdiction in this Court over claims against the United States founded on an "Act of Congress or any regulation of an executive department." As previously discussed, plaintiff's claim is founded on the Dependents' Medical Care Act, 10 U.S.C. §§ 1071 *et seq.*, and the CHAMPUS regulations, 32 C.F.R. Part 199.

■ Although an elaborate scheme of administrative review of program determinations is delineated within the CHAMPUS regulations, 32 C.F.R. § 199.16, the standard of judicial review of such agency determinations is not specified. Nevertheless, our predecessor court, the United States Court of Claims, has held that in reviewing CHAMPUS actions, the "administrative procedure can only be overturned upon a showing that the administrators acted arbitrarily, capriciously, or were so grossly erroneous as to be in bad faith, as for instance where they may have acted without substantial evidence to support their decision or where they exceeded their authority." *King v. United States*, 215 Ct.Cl. 876, 880, 566 F.2d 1190 (1977) (citations omitted). This standard of review has also been applied twice by this Court. *Grant Assoc., Inc. v. United States*, 11 Cl.Ct. 816, 825–26 (1987); *Prindle v. United States*, 5 Cl.Ct. 493, 497 (1984).

■ In conducting this review, the Court shall examine the whole administrative record. While this inquiry must be searching and careful, it must also remain limited and narrow. *Marsh v. Oregon Natural Resources Council,* — U.S. —, 109 S.Ct. 1851, 1861, 104 L.Ed.2d 377 (1989) (citing *Citizens To Preserve Overton Park v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 822, 28 L.Ed.2d 136 (1971)). Clearly, however, a *de novo* judicial review of the procedures that the plaintiff practices concerning waiving beneficiary/sponsor liability and billing for certain educational costs would be inappropriate. *King,* 215 Ct.Cl. at 879–80; *Grant Assoc. Inc.,* 11 Cl.Ct. at 825; *Prindle,* 5 Cl.Ct. at 497. Unless the record reveals that the agency determination is arbitrary or capricious, unsupported by substantial evidence, or violates the statute or implementing regulations, it is to be upheld. *Morrow v. United States,* 227 Ct.Cl. 290, 296, 647 F.2d 1099, 1102, *cert. denied,* 454 U.S. 940, 102 S.Ct. 475, 70 L.Ed.2d 247 (1981); *Missouri Health & Medical Org., Inc. v. United States,* 226 Ct.Cl. 274, 280, 641 F.2d 870, 874 (1981); *King,* 215 Ct.Cl. at 880; *Julius Goldman's Egg City v. United States,* 214 Ct.Cl. 345, 354, 556 F.2d 1096, 1100–01 (1977), *aff'd,* 697 F.2d 1051 (Fed.Cir.), *cert. denied,* 464 U.S. 814, 104 S.Ct. 68, 78 L.Ed.2d 83 (1983); and the Court is "not empowered to substitute its judgment for that of the agency." *Serrano v. United States,* 222 Ct.Cl. 52, 60, 612 F.2d 525, 530 (1979) (quoting *Citizens To Preserve Overton Park, Inc.,* 401 U.S. at 415–16, 91 S.Ct. at 823).

## II. The CHAMPUS Regulations

### A. *Procedural Validity*

The plaintiff contends that the waiver and education provisions of the regulations are procedurally invalid. If these contentions are, in fact, correct, then the final decision of CHAMPUS must be set aside as it would then be premised on regulations that do not have the force and effect of law. *See Chrysler Corp. v. Brown,* 441 U.S. 281, 313, 99 S.Ct. 1705, 1723, 60 L.Ed.2d 208 (1979) (regulations subject to Administrative Procedures Act not afforded "force and effect of law" if not promulgated pursuant to the statutory procedural minimum found in Act); *G.L. Christian & Assoc. v. United States,* 160 Ct.Cl. 58, 65, 320 F.2d 345, 350, *cert. denied,* 375 U.S. 954, 84 S.Ct. 444, 11 L.Ed.2d 314 (1963) ("Regulations reasonably adapted to the administration of a Congressional act, and not inconsistent with any statute, have 'the force and effect of law' "). If, however, the CHAMPUS regulations are valid, then plaintiff's arguments that the CHAMPUS decision is arbitrary and capricious and contrary to the statute must be addressed.

Plaintiff challenges the procedural validity of both the waiver provision and the educational cost provisions, asserting that the regulations were not issued in accordance with the rule-making requirements of the Administrative Procedures Act (APA), 5 U.S.C. § 553 (1988).[6] Specifically, plaintiff alleges that the regulations were issued without prior public notice and without the opportunity to comment on them before becoming effective.

In response to this challenge of validity, the Government relies on the "good cause" exception to the notice and comment procedures, 5 U.S.C. § 553(b)(B), to justify the publication of the CHAMPUS regulations as final rules on April 4, 1977. Pursuant to this exception, an agency is not required to follow the notice and comment provisions of the APA:

> [W]hen the agency for good cause finds (and incorporates the finding and a brief statement of reasons therefor in the rules issued) that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest.

*Id.*

When the CHAMPUS regulations were published in the Federal Register, the Sec-

---

**6.** In accordance with the CHAMPUS regulations, plaintiff properly reserved this challenge of the legality of the regulations for presentment to this Court. The appeal procedures outlined in the regulations prohibit any such challenge during the various stages of administrative review. *See* 32 C.F.R. § 199.16(a).

retary of Defense stated in the introductory paragraphs that the regulations were adopted without the use of the proposed rulemaking process since "it was determined that further delay in their adoption would be contrary to the public interest." 42 Fed.Reg. 17,972 (1977). In further explanation of the decision to adopt the CHAMPUS regulations without additional delay, the Federal Register notice provided the following reasons:

> Among other things, the absence of comprehensive regulations for CHAMPUS has led to administrative difficulties and, in some cases, litigation regarding basic issues like eligibility to benefits, scope of authorized benefits, minimum standards and requirements for authorized providers, acceptable provider billing practices, and reasonable provider charges. In view of these and other problems relating to the administration of CHAMPUS which derive at least in part from the lack of comprehensive implementation, adoption [of final regulations] at the earliest practicable date was deemed necessary.

*Id.*

Written comments on the regulations were invited for 60 days "in recognition of the value of public comment," and any changes in the regulations effected by these comments, which would increase the rights, benefits, or privileges would then become effective retroactive to the date of the notice, April 4, 1977, insofar as administratively feasible. *Id.* Thereafter, notice of a public hearing on the CHAMPUS regulations was published on August 15, 1977, 42 Fed.Reg. 41,118 (1977), and the hearing was held on September 7–8, 1977. Subsequent amendments to the regulations resulted from administrative re-evaluation and the public comments, and those amendments that related to increased benefits were retroactively effective as of June 1, 1977. 44 Fed.Reg. 18,661 (1979).

It is the Government's position that if the reasoning set forth in the initial publication does not substantiate good cause for bypassing the statutory notice and comment provisions, then the invitation to comment after the publication and the holding of a public hearing constitutes substantial compliance with the APA so as to support a finding that the regulations are procedurally valid.

■ The good cause exception to section 553(b) is to be "narrowly construed," *Alcaraz v. Block,* 746 F.2d 593, 612 (9th Cir. 1984) (quoting *New Jersey, Dep't of Envtl. Protection v. United States Envtl. Protection Agency,* 626 F.2d 1038, 1045 (D.C.Cir. 1980)), so that the exception does not become an all-purpose escape clause. *National Fed'n of Fed. Employees v. Devine,* 671 F.2d 607, 610 (D.C.Cir.1982) (citing *American Fed'n of Gov't Employees v. Block,* 655 F.2d 1153, 1156 (D.C.Cir.1981)). Rather, the exception is an important safety valve that should be utilized when delay would do real harm. *United States Steel Corp. v. United States Envtl. Protection Agency,* 595 F.2d 207, 214 (5th Cir.1979).

■ In order for an agency to invoke the good cause exception, certain prerequisites must be met. First, the agency must believe that compliance with the 30–day pre-promulgation notice rule is "impracticable, unnecessary or contrary to the public interest," *Buschmann v. Schweiker,* 676 F.2d 352, 356 (9th Cir.1982) (quoting *Kelly v. United States Dep't of the Interior,* 339 F.Supp. 1095, 1101 (E.D.Cal.1972)), and second, the agency must publish this finding and a short statement of reasons with the new regulations. *Id.*

The Secretary of Defense, in adopting the CHAMPUS regulations, did determine that compliance would be "contrary to the public interest" and did furnish a statement outlining the reasons why "adoption at the earliest practicable date was deemed necessary." *See* 42 Fed.Reg. 17,972 (1977). The issue then becomes whether these reasons, as stated in the Federal Register notice, constituted good cause in order to fit within the exception.

Good cause is not defined within the provisions of the APA; therefore, the inquiry into whether good cause has been properly invoked must proceed on a case-by-case basis, with a sensitivity to the totality of the factors at play. *Alcaraz,* 746 F.2d at

612. As with all subjective terms, the range of appropriate meanings flows on a sliding scale from what is clearly not good cause to the other extreme of what is obviously good cause, leaving the middle of the continuum as a line drawing contest.

■ Good cause is clearly not established by the mere recital of good cause. *Mobil Oil v. Department of Energy*, 610 F.2d 796, 803 (Temp.Emer.Ct.App.1979), *cert. denied*, 446 U.S. 937, 100 S.Ct. 2156, 64 L.Ed.2d 790 (1980) (the mere statement that the agency finds normal rulemaking procedures impracticable and that good cause exists is not sufficient to create good cause). Nor does the mere existence of deadlines for agency action, whether set by statute or court order, by itself, constitute good cause to circumvent the rulemaking procedures. *See United States Steel Corp. v. Environmental Protection Agency*, 649 F.2d 572, 575 (8th Cir.1981); *Western Oil & Gas Assoc. v. United States Envtl. Protection Agency*, 633 F.2d 803, 812 (9th Cir.1980); *United States Steel Corp.*, 595 F.2d at 213. While deadlines are a factor to consider, the agency must still show the impracticability of affording notice and comment. *United States Steel Corp.*, 595 F.2d at 213.

■ Also found at this end of the spectrum, where good cause is not legitimated, is such reasoning as the agency's intent and need to provide immediate guidance and information. Such a conclusory statement as "normal [rule-making] procedures were not followed because of the need to provide immediate guidance and information * * * ", would swallow the rulemaking requirements if this alone fulfilled the good cause exception. *Mobil Oil*, 610 F.2d at 803 (quoting *Nader v. Sawhill*, 514 F.2d 1064, 1068 (Temp.Emer.Ct.App.1975)).

■ Moving to the other end of this continuum, good cause is evidence when the delay created by the notice and comment requirements would result in serious damage to important interests. *National Fed'n of Fed. Employees*, 671 F.2d at 611–12. These important interests have been construed to include the potential harm to all the parties involved, *i.e.*, a threat to the

agency, as well as to the stability of the particular program, and a threat to the welfare of the employees and annuitants; the lack of accurate information regarding health insurance rates and benefits, and the existence of pending litigation, which created uncertainty as to the program. *Id.* at 609–11.

■ Furthermore, when there is a lack of specific and immediate guidance from the agency that would create confusion, economic harm, and disruption, not only to the participants of the program, who are forced to rely on antiquated standards, but would also extend to consumers in general, the good cause exception is a proper solution to ameliorate this expected harm. *See American Fed'n of Gov't Employees v. Block*, 655 F.2d 1153, 1157 (D.C.Cir.1981). When the intended beneficiaries under a statutory program would suffer financial hardships and the loss or delay of medical benefits, the agency has good cause to forego the advance notice and comment requirements. *See North American Coal Corp. v. Director, Office of Workers' Compensation Programs*, 854 F.2d 386, 389 (10th Cir.1988).

■ Given these examples of what constitutes good cause, when the totality of the factors at play in the Secretary of Defense's decision to invoke this exception are considered, the CHAMPUS regulations clearly fall within the range of good cause. Without the immediate promulgation of the CHAMPUS regulations, the CHAMPUS program would have continued to suffer administrative difficulties that had already resulted in and would likely continue to result in litigation over beneficiary benefits.

The presence of litigation signalled confusion and uncertainty over who was eligible for benefits, the scope of those benefits, the standards that must be met by the providers, and what were reasonable charges for benefits. Further delay would have perpetuated this confusion and could have imposed such potential hardships on the intended beneficiaries as being denied all benefits or only being given limited ben-

efits and being charged a rate that was not reasonable. Therefore, the dependents of members and former members of the armed forces, for whose benefit the Dependents' Medical Care Act was passed, would have suffered medical and financial hardships if the regulations had been delayed further.

 The CHAMPUS regulations not only fit within the good cause exception, but they also substantially comply with the APA. Plaintiff cannot establish the lack of substantial compliance by showing such factors as no notice at all, basically unfair procedures, lack of opportunity to be heard, absence of publication, and similar serious defects. *See California by and through the State Lands Comm'n v. Simon*, 504 F.2d 430, 439–40 (Temp.Emer.Ct. App.), *cert. denied*, 419 U.S. 1021, 95 S.Ct. 496, 42 L.Ed.2d 294 (1974). Notice was published of the adopted regulations and the opportunity to comment was provided by inviting written comments and at a public hearing without employing unfair procedures or other defective methods.[7]

B. *Reasonableness of Interpretation and Deference Due*

1. *Waiver of Liability Provision*

Plaintiff herein alleges that the CHAMPUS waiver regulation is not consistent with the statute and thus should not be entitled to deference. Although the regulation states with specificity that any waived amount of beneficiary/sponsor liability must be reduced from the share billed to CHAMPUS, it is the plaintiff's position that the statute does not authorize such a "penalty." A penalty, according to

plaintiff, is incurred by the provider since the statute does not address the obligation of the provider to collect the payment from the beneficiary/sponsor and similarly does not address the situation where a beneficiary/sponsor is unable to pay the 25 percent share. Thus, when the provider cannot collect the beneficiary/sponsor share and when the provider cannot receive the full 75 percent from CHAMPUS, it is penalized by a deprivation of such revenues.

The Government's response to this argument is that cost-sharing is mandated by the Dependents' Medical Care Act, which explicitly sets forth that active duty members are required to pay $25 for each admission and all other CHAMPUS beneficiary/sponsors are required to pay 25 percent of the reasonable charges for medical care provided by an authorized civilian provider. 10 U.S.C. §§ 1079(b)(1), 1086(b)(3). Therefore, the Government contends that the regulation is plainly consistent with the legislative intent of the statute and a reasonable interpretation since it states that CHAMPUS is not to pay the entire cost of care, but rather share the cost proportionately with the beneficiary/sponsor.

The Dependents' Medical Care Act, 10 U.S.C. §§ 1071 *et seq.*, specifically the provisions that describe the cost-sharing program, provide that the administering Secretaries, *i.e.*, the Secretary of Defense and the Secretary of Health and Human Services, shall prescribe joint regulations to administer the CHAMPUS program. *See* 10 U.S.C. §§ 1079, 1086. Thus, it was contemplated that regulations would be issued in order to implement the program.

When legislative or substantive regulations are "issued by an agency pursuant to

---

7. Subsequent changes to the CHAMPUS regulations, after the initial adoption publication at issue here, have been found not to be in substantial compliance with the APA requirements. A notice of intent to institute changes in the payment system for RTCs and stating that a new Participation Agreement must be entered into by June 1, 1985, was published on September 14, 1984, in the Federal Register. 49 Fed.Reg. 36,094 (1984). The notice did not, however, specify any of the terms of the new agreement. A separate notice was thereafter published on July 1, 1985, delaying the effective date of the agreement until October 1, 1985. 50 Fed.Reg.

26,988 (1985). The terms and conditions of the proposed agreement were furnished to RTCs through attachments to letters. The district court found that these proposed changes in the agreements were subject to the rulemaking requirements of the APA, and that the agency did not substantially comply because there was no notice of the specific provisions of the agreement, only generalities, until five months after critical dates used to determine reimbursement amounts. *See National Ass'n of Psychiatric Treatment Centers for Children v. Weinberger*, 658 F.Supp. 48, 50–55 (D.Colo.1987).

statutory authority and * * * implement the statute, * * * [s]uch rules have the force and effect of law." *Batterton v. Francis*, 432 U.S. 416, 425 n. 9, 97 S.Ct. 2399, 2405–06 n. 9, 53 L.Ed.2d 448 (1977) (quoting U.S. Dept. of Justice, Attorney General's Manual on the Administrative Procedure Act 30 n. 3). *See also G.L. Christian & Assoc.*, 160 Ct.Cl. at 65, 320 F.2d at 350. It is a long-established principle that an interpretation of a statute manifested by the regulations of an agency charged with its administration is due substantial deference. *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 844, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694, *reh'g denied*, 468 U.S. 1227, 105 S.Ct. 28, 82 L.Ed.2d 921 (1984); *Blum v. Bacon*, 457 U.S. 132, 141, 102 S.Ct. 2355, 2361, 72 L.Ed.2d 728 (1982); *Newman v. Teigeler*, 898 F.2d 1574, 1578 (Fed.Cir. 1990); *American Lamb Co. v. United States*, 785 F.2d 994, 1001 (Fed.Cir.1986).

This principle has been quoted and followed by the Court of Appeals for the Federal Circuit, as follows:

> The agency's construction of a statute should be followed unless there are compelling indications that it is wrong. The agency's interpretation need not be the only reasonable construction, or the one the court would have adopted had the question arisen initially in a judicial proceeding; it just has to be a reasonable interpretation.

*Chula Vista City School Dist. v. Bennett*, 824 F.2d 1573, 1579–80 (Fed.Cir.1987), *cert. denied*, 484 U.S. 1042, 108 S.Ct. 774, 98 L.Ed.2d 861 (1988). Therefore, unless the CHAMPUS regulations are clearly incompatible with the statute, the Court should not strike them.

 While the plaintiff accurately recounts that the statute does not explicitly provide for such a reduction in the Government's share when the provider waives beneficiary/sponsor liability, plaintiff cannot show that the waiver regulation is not a reasonable interpretation of the statute. The statute establishes the program "to assure the health benefits are available," and specifically delineates a payment plan for both dependents of active members and former members of the uniformed services. This delineation shows various rates for various types of health care based on the number of members in a family that are covered.

The statute does not, however, conclude with a catch-all provision stating that all the established rates may be ignored if the beneficiary/sponsor cannot pay, and therefore, the Government will pay the entire cost of the health care. In fact, both sections 1079 and 1086 state that the health plans "shall include provisions for payment by the patient." 10 U.S.C. §§ 1079(b), 1086(b).

The fact that the statute does not spell out that the provider is to collect the beneficiary/sponsor's share and does not address what is to be done if the beneficiary/sponsor is unable to pay cannot be construed as a penalty to the provider by reducing the Government's liability. The statutory language could not be clearer: some contribution payment is to be made by the patient, and in the case of inpatient care, 25 percent of the charges is to be paid by the patient.

Surely, a profit-making organization does not need to be statutorily ordered to collect its fees from individuals receiving health benefits from it or it would not remain profitable for very long. The same is true in cases where the recipient is unable to pay for the benefits received—a profit-making organization realizes that uncollected accounts are a cost of doing business. Therefore, the waiver provision in the regulations does not impose any penalty on the provider since the provider, in essence, holds the key to its "kitty." If it does not attempt to collect payments from the beneficiary/sponsors or even bill for the benefits, it cannot expect to be paid, and if it provides benefits to those who are later unable to pay, it is incurring one of the risks of doing business. Simply because Congress has not chosen to fully subsidize the CHAMPUS program by paying the entire cost of the care, the plaintiff cannot succeed in alleging that the waiver regula-

tion is not a reasonable interpretation of and supported by the statute.

On the contrary, the regulation is consistent with the statutory language. The statute reads:

> [T]he plans contracted for * * * shall contain the following provisions for payment by the patient:
>
> * * * * * *
>
> (3) 25 percent of the charges for inpatient care.

10 U.S.C. § 1086(b)(3). Thus, it is implied that 75 percent of the charges will be paid by the Government. If, however, the provider waives the beneficiary/sponsor share, then the total charges for the care would be the amount that was billed to the Government. Since the Government is only responsible for 75 percent of the total charges, it thus becomes only responsible for 75 percent of the amount it was billed because that amount reflects, in actuality, the totality of the charges. That is exactly what the waiver provision in the regulations specifies. Therefore, the waiver regulation is a reasonable interpretation of the statute and entitled to substantial deference.

### 2. *Provision excluding educational costs*

Plaintiff next alleges that the regulations prohibiting the payment of educational costs are substantively invalid and contrary to the statute. The basis of the plaintiff's argument is the absence of such a prohibition in the statute. Since the statute does not specifically exclude education costs, plaintiff reads this as an authorization to pay, which would be contrary to the regulations. Further, plaintiff attempts to support its argument by pointing to a 1984 amendment to section 1079(a) whereby "special education may not be provided [as authorized health care], except when provided as secondary to the active psychiatric treatment on an institutional inpatient basis." 10 U.S.C. § 1079(a)(9). Thus, plaintiff contends this new language supports the payment of educational services provided by Woods as these services were secondary to the psychiatric treatment.

The Government's rebuttal to these arguments is that educational services are not enumerated within the types of health care that may be provided under the CHAMPUS program. Section 1086 of title 10 of the United States Code authorizes the same health benefits as contracted for under section 1079(a), which refers to the health care as authorized under section 1076. Section 1076 states that dependents are entitled to the medical care as prescribed by section 1077, which lists the *only* types of health care that may be provided. Educational costs are not one of the "only types" listed, and the Government asserts that this exclusion, together with the absence of any indication in the statute that any kind of education is to be provided, supports the exclusionary language of the regulations.

As outlined in the above discussion of the waiver provision, the question for the Court is whether the agency's construction of the statute is rational and consistent with the statute. *Sullivan v. Everhart,* — U.S. —, 110 S.Ct. 960, 964, 108 L.Ed.2d 72 (1990) (citing *NLRB v. United Food & Commercial Workers Union,* 484 U.S. 112, 123, 108 S.Ct. 413, 426, 98 L.Ed.2d 429 (1987)). The fact that a recent amendment was made to section 1079, providing that special education may be provided if it is secondary to the active psychiatric treatment, does not add any credence to the plaintiff's challenge. On the contrary, the limited exception, *i.e.,* education is provided only if secondary to treatment, indicates that educational costs are still to be excluded except in these specific instances. Therefore, if a congressional amendment to the statute, as late as 1984, continued to exclude educational costs but for this narrow circumstance, plaintiff cannot succeed in arguing that the CHAMPUS regulations, interpreting the former statutory language, are unreasonable as to these costs.

Even if the educational services provided by the plaintiff were secondary to the psychiatric treatment, Woods cannot prevail on this issue because the period for which Woods seeks reimbursement is from January 1, 1979, through December 31, 1983—prior to the date of this amendment.

While Congress could have legislated retroactively, it did not, and plaintiff cannot reap the benefits of "after-the-fact" legislation.

Furthermore, an examination of the various types of health care that may be provided, 10 U.S.C. § 1077, reveals a common denominator—medical care.[8] Those types of health care that are only ancillary to medical care are excluded, such as domiciliary or custodial care, prosthetic devices, hearing aids, orthopedic footwear, and eyeglasses. 10 U.S.C. § 1077(b). Providing educational services is not ordinarily connected to medical care, unless in a rehabilitative or therapeutic context, and in that situation, would be conducted by a medically trained professional.

If, on the other hand, the regulations had included the cost of educational services and supplies, then the Court would have been more persuaded that the agency had, indeed, strained the interpretation of the statute beyond one that is rational and consistent with the statutory language. As the regulations now appear, however, that is not the case.

III. The CHAMPUS Final Decision

A. *Waiver of Liability*

 Plaintiff asserts that the final decision of CHAMPUS is arbitrary and capricious based on a number of reasons. First, plaintiff reiterates its penalty argument, urging that it is irrational to penalize the provider when the beneficiary/sponsor cannot pay. Second, plaintiff alleges that by forcing the provider to collect the co-payments from the beneficiary/sponsor, it will frustrate the purpose of the statute because the beneficiary/sponsor will be unable to obtain treatment. Third, plaintiff argues that since the CHAMPUS final decision did not concur in the auditors' opinions that plaintiff's bad debt expenses constituted a waiver of liability, the plaintiff should not be penalized for the waiver of beneficiary/sponsor liability because both techniques had the same economic effect. Finally, plaintiff contends that the final decision is inconsistent with the interim policy of the agency on waiving liability and inconsistent with a previous agency decision involving the waiver issue.

In response to the plaintiff's allegations of an arbitrary and capricious decision, the Government merely advances that no CHAMPUS policy existed that would permit providers to waive liability. Rather than embracing a general statement of policy, the Government maintains that only internal memoranda were issued during a period of disagreement as to what the policy should be with respect to the waiver of liability that was occurring.

As a reviewing Court of an agency's action to determine if such actions were arbitrary and capricious, the standard that must be followed is "whether the decision was based on consideration of the relevant factors and whether there has been a clear error of judgment." *Citizens to Preserve Overton Park*, 401 U.S. at 416, 91 S.Ct. at 824. An agency decision is arbitrary and capricious to the extent that the agency "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 2867, 77 L.Ed.2d 443 (1983).

The final decision of CHAMPUS was issued on January 5, 1989, after receiving the hearing officer's recommended decision on December 1, 1987. After a "due consideration of the appeal record," the Director of CHAMPUS adopted the recommended decision as his final decision. The hearing officer's recommended decision addressed all of the allegations, in detail, that plaintiff is now alleging as arbitrary and capricious.

---

**8.** The statute lists such benefits as hospitalization, drugs, treatment of medical and surgical conditions, treatment of contagious diseases, maternity and infant care, and ambulance service when medically necessary. *10 U.S.C.* § 1077(a).

Plaintiff's penalty argument was proposed to the agency in plaintiff's position paper, which accompanied its request for a formal review, and appears to be the same argument now raised before this Court. There, as here, plaintiff argues that it should not be penalized for failing to take any efforts to collect the beneficiary/sponsor's sums. Likewise, the plaintiff's contention that the purpose of the statute is frustrated when health benefits become unavailable due to the beneficiary/sponsor's inability to pay was raised in the plaintiff's position paper filed with the agency.

While plaintiff's concern over availability of benefits to those suffering from financial difficulties is certainly laudable, the hearing officer succinctly separated these charitable objectives from the regulatory obligations:

> The government has seen fit to distinguish between the amount of co-pay required of active military sponsors as opposed to the amount required from retired military sponsors. For whatever reason the government has seen to distinguish between these two classes of military sponsors, it is the duty of the provider to honor that distinction * * *.

CHAMPUS Final Decision, Administrative Record (Adm.Rec.), Exhibit A at 61. As the final decision reflects, the cost-sharing provisions are not imposed simply to make it difficult for beneficiaries/sponsors to obtain benefits, thereby frustrating the statutory purpose; but rather, to limit expenditures by the Federal Government and to discourage overutilization and abuse of the health care system.

Furthermore, the testimony at the hearing revealed that there was no written documentation of the criteria that plaintiff used to determine a beneficiary/sponsor's ability to pay, nor was there a set list of questions or information uniformly used in every admission. Even after it had been determined that the beneficiary/sponsor was unable to pay, based on the initial discussion with the beneficiary/sponsor, there was no documentation of these discussions as to ability to pay contained in the patient's record. The HHS auditor, who supervised the second audit of the plaintiff and who testified at the hearing, stated that the plaintiff's criteria to determine ability to pay was "woefully inadequate," and evidence ascertained through that audit indicated waivers "were granted across the board to retired military sponsor [sic] without any documented determination as to their ability to pay." Adm.Rec., Exhibit A at 60.

Although plaintiff has persistently maintained that the statute is silent as to the provider's obligation to collect the co-payment from the beneficiary/sponsor, two of the plaintiff's officers testified that bills were routinely sent for incidental expenses such as bus tickets, gym clothes, and repairs to musical instruments, even though these same beneficiary/sponsors had been determined to be unable to pay the co-payment. The explanation offered for the collection attempts of these expenses, which were likewise not ordered by the statute, was that "billing the sponsors for [these nonallowable CHAMPUS costs] was to encourage the sponsors to provide whatever incidentals the beneficiaries required themselves." Adm.Rec., Exhibit A at 60. Plaintiff offered no rationale as to why this same encouragement principle was not applied to the collection of the co-payment liability.

Plaintiff's counsel raised the issue of the similarities between waiving the beneficiary/sponsor liability and the subsequent bad debt expense at the hearing and suggested that:

> "[W]aivers" granted were, in reality, prospective bad debts which were written off by waiver rather than be entered onto the books and written off a [sic] bad debts at a later date.

Adm.Rec., Exhibit A at 58. Although the CHAMPUS initial decision determined that failure to pursue the collection of bad debts constituted a waiver, the formal review decision, issued prior to the hearing, did not adopt this view. In rejecting this determination, the practical rules of doing business were relied upon:

> It seems highly unlikely, however, that the regulatory provision respecting waiv-

er of cost-share was intended to invalidate the commonly accepted practice of writing off uncollectible accounts receivable as bad debts. Some level of bad debt write-offs is inevitable with all health care providers and it is quite inconceivable that the authors of the regulation would incorporate a provision which ignors [sic] this economic reality. It must be assumed that the authors did not intend to enact an unrealistic or unreasonably burdensome provision. Rather, the intent of the provision is more properly viewed as being to eliminate any incentive on the provider's part to routinely waive all or a portion of the beneficiary's cost-share liability.

CHAMPUS Formal Review Decision, Adm. Rec., Exhibit C–13 at 13–14.

Thereafter, at the hearing, plaintiff presented the suggestion that waivers and bad debt expenses were, in reality, synonymous. Granted, these two concepts may result in the same bottom line, but they are not designed to reach that point by the same path. While it is an economic reality that accounts receivables often degenerate into the bad debt expense account, that is normally not the original intent of a profit-making organization. If the plaintiff practiced this "business decision to write-off the bad debt prior to admission rather than go[ing] through the format of continuously billing the sponsors," as it asserted at the hearing, Adm.Rec., Exhibit A at 61, with all its patients as it did with the CHAMPUS patients, then Woods' financial statements would defy economic reality since the plaintiff's corporate net profit continued to increase from $121,714 in 1981 to $134,950 in 1982 to $315,295 in 1983. *See* Audit Report of October 31, 1984, Adm.Rec., Exhibit C–3 at 17.

Plaintiff's final argument asserting that the CHAMPUS decision is arbitrary and capricious is based on its belief that CHAMPUS had an interim policy permitting such waivers. In addition, the plaintiff points to another CHAMPUS final decision, rendered by the Office of the Assistant Secretary of Defense (Health Services), in which the charge of waiving beneficiary/sponsor liability was dismissed, to

support its contention that CHAMPUS did not consistently apply the waiver regulations. At the hearing, plaintiff presented several memoranda that discussed the waiver issue and the confusion over how to proceed with paying claims. In one internal memorandum from the Assistant Secretary of Defense for Health Affairs to the Director, CHAMPUS, dated July 21, 1981, this issue was addressed as follows:

> [W]e think it inappropriate to severely penalize providers who, apparently acting in good faith, have provided authorized benefits * * *. [W]e request that you instruct your fiscal intermediaries to pay all suspended claims of the type in question that are otherwise payable, when it is determined that the charge to the Government has not been adjusted in order to cover the beneficiary's share and that payment would not exceed the amount the Government would otherwise be authorized to pay as its share of the cost for the medical care provided.

Adm.Rec., Exhibit C–29–E. The CHAMPUS final decision aptly points out that plaintiff admitted it was not aware of this interim policy nor did it rely on it, and that, indeed, this was only an interim policy that would be later replaced with a permanent policy. As such, it did not even rise to the level of a statement of agency policy, but was only an internal decision. *See Pacific Gas & Elec. Co. v. Federal Power Comm'n*, 506 F.2d 33, 38 (D.C.Cir.1974) (general statement of policy not binding nor can agency apply or rely on it as it is only announcement of agency's tentative intentions for future).

The permanent policy or final resolution, agreed to by the Defense Audit Service and the Office of the Assistant Secretary of Defense (Health Affairs), stated that providers routinely waiving beneficiary liability circumvent the law and violate the regulations. Adm.Rec., Exhibit C–29–J at 2. After recognizing this final resolution as the agency policy, the CHAMPUS final decision notes that even if the earlier memorandum were "policy," it could not be enforced as it violated both the statute and the regulations. Furthermore, as the

CHAMPUS final decision repeatedly states, plaintiff did not rely on this interim policy as the basis for waiving liability nor was plaintiff even aware of its existence. Therefore, plaintiff cannot assert it was acting in good faith reliance on the interim policy in order to claim immunity from any penalty.

At the same time that the plaintiff was unaware of this interim policy temporarily allowing the claims of good faith providers, it was fully aware of the prohibition on waiving beneficiary/sponsor liability. This was evident, as noted in the CHAMPUS final decision, by three separate letters sent to the plaintiff on August 7, 1981, March 23, 1982, and April 13, 1983, stating that:

> Facilities which provide services under CHAMPUS must bill for, and collect, that portion of the total charges which is the responsibility of the Uniformed Service sponsor. The sponsor's cost-share cannot be waived or absorbed by the facility.

Adm.Rec., Exhibit C–30.

A close reading by the hearing officer of the other CHAMPUS appeal that plaintiff alleges involved the same issue of waiver liability, which was dismissed against that provider, revealed that this issue was only ancillary to the case. That case, as discussed in the final decision, focused on the termination of a provider, and it was not necessary to rule on the waiver issue in order to uphold the termination. Adm. Rec., Exhibit C–29–M. Therefore, the issue was dismissed. Plaintiff cannot use this reasoning to support its allegations that CHAMPUS failed to consistently apply its regulations.

Based on the testimony given and the exhibits presented, the hearing officer determined that the plaintiff had improperly waived the liability amounts, and the Director of CHAMPUS adopted this determination as his final decision. This Court can find no error of judgment in this decision or the lack of sufficient consideration of the relevant factors in order to set it aside as being arbitrary and capricious. Further-

more, substantial evidence supported the decision as rendered.

### B. *The Exclusion of Educational Costs*

■ As with the waiver provision, plaintiff likewise challenges the CHAMPUS final decision as being arbitrary and capricious with respect to disallowing its educational costs. According to the plaintiff, this holding is contrary to case law dealing with the same issue under the Medicare statutes; erroneous in that the hearing officer ruled that since teachers are not authorized providers, the educational services are not covered; and fallacious because the hearing officer "seemingly suggests" that education is the obligation of the patient's parents and the provider to assure that the state affords an education to the child. Furthermore, the plaintiff contends that this refusal to pay is inconsistent with the treatment given another RTC as to educational costs.

At the hearing, the plaintiff presented the argument that these costs should be covered because: (1) the education was part of the treatment and ordered by the physician; (2) the education was required by the state, the accrediting agency, and the Participation Agreement; (3) the costs incurred were to pay teacher salaries and supplements for responsibilities above those ordinarily attached to the classroom situation; and (4) CHAMPUS did not seek recovery of these same costs from another RTC.

In the hearing officer's recommended decision, each of these contentions was addressed. The testimony at the hearing outlined the educational services provided to the patients at the plaintiff's institute: some attended the public schools in the local school district; some attended special education classes in the public schools; and those with more severe problems were educated in a school at the plaintiff's institute.

During the period of the first audit, the local school district refused to pay the teachers who taught at the plaintiff's on-campus school because not all the students were residents of the district. An agreement was thereafter reached whereby the

school district supplied teachers to plaintiff's school, and the plaintiff supplemented these salaries for the additional work required, *i.e.*, extra paper work, daily behavior reports, and interaction with the treatment team.

Despite plaintiff's insistence that such educational services were therapeutic and a part of the treatment program, the hearing officer determined that teachers did not fit within the provisions of the regulations as authorized CHAMPUS providers, 32 C.F.R. § 199.12, and furthermore, found these services to fall within those services excluded by the regulations.[9] Not only did the plaintiff's educational services, which were "an integral part of the treatment plan," Adm. Rec., Exhibit A at 65, as stated by the plaintiff's Vice–President for Administration, who was not a doctor or a psychiatrist, Adm.Rec., Exhibit A at 23, fit within the exclusion cited by the hearing officer, but the regulations specifically exclude educational costs in two separate provisions and in the Appendix containing the CHAMPUS Standards. *See* 32 C.F.R. §§ 199.-10(b)(1)(iv), 199.10(g)(44), App. A(b)(8).

Along this same line of reasoning, the hearing officer stated that:

> The fact that education was provided to those students who were too disturbed to attend the public schools * * * does not convert the educational component of that service into a therapeutic service. The purpose of having the teachers in the on campus school was to provide the patients with an education—English, History, Mathematics, Geography, etc.—and education, whether routine or special, is not eligible for CHAMPUS cost-sharing * * *.

Adm.Rec., Exhibit A at 65. Therefore, the salaries and salary supplements were found to be disallowed.

It was pointed out in the CHAMPUS final decision that the state requirements and the accreditation requirements for an RTC to provide education are due to the ages of the patients and are not the dispositive factor of eligibility for CHAMPUS benefits. As stated in the regulations, the final decision reiterated that if the state or other public entity is unwilling or refuses to pay for the education, then there is a built-in mechanism contained in the regulations whereby the provider may apply to CHAMPUS for an exception. *See* 32 C.F.R. § 199.10(b)(1)(iv). Plaintiff did not, however, attempt to utilize this mechanism despite the local school district's refusal to pay during the term of the first audit.

The audit report of another RTC, upon which plaintiff relied to assert that the agency did not deny educational costs consistently among all RTCs, was found by the hearing officer to be far from conclusive as to this issue. Adm.Rec., Exhibit C–4 at 81–89. In fact, the final decision quoted the specific language from this other audit, which, contrary to plaintiff's assertions, left the issue unresolved until CHAMPUS personnel clarified which costs were regular or routine as opposed to allowable costs. Although plaintiff is again arguing that it is blatantly arbitrary and unfair to disallow these costs for one RTC while allowing them for another, there is no support for this allegation, as was likewise recognized in the CHAMPUS final decision.

After discussing the elements of plaintiff's challenges, the hearing officer determined in her recommended decision that the educational costs were properly denied; however, she disputed the method of calculating the disallowances that resulted from the first audit. Not only were certain costs included that should have been excluded, *i.e.*, the salary of the education coordinator and the costs of lunches provided to pa-

---

**9.** The hearing officer quoted 32 C.F.R. § 199.10(g), entitled *Exclusions and limitations,* subparagraph 76:

"*Not specifically listed.* Services and supplies not specifically listed as a benefit in this Regulation. However, this exclusion is not intended to preclude extending benefits for those services and supplies specifically determined to be covered within the intent of this regulation by the

Director, CHAMPUS (or a designee) even though not otherwise listed.

"NOTE: The fact that a physician may prescribe, order, recommend or approve a service or supply does not, of itself, make it medically necessary or make the charge an allowable expense, even though it is not specifically listed as an exclusion." *See* Adm.Rec., Exhibit A at 64.

tients attending public schools, but the percentage used to calculate the disallowance was based on an incorrect ratio (the ratio of CHAMPUS-eligible patients to the total patient population should have been used and not the ratio of the CHAMPUS patients in the on-campus school to the total patients in the school). Thus, the corrections made by the hearing officer as to the methods of calculation, which were subsequently adopted in the final decision, yielded a savings to the plaintiff of some $19,721.03.

Plaintiff cites two Medicare program cases to support its contention that the educational costs should be covered. These cases were cited in the plaintiff's post-hearing position paper to the Appeals and Hearing Division of CHAMPUS, as well as in plaintiff's motion for summary judgment to this Court. While plaintiff sees these cases as virtually identical to the case at bar, this Court does not share this view.

In *Charter Peachford Hosp., Inc. v. Bowen,* 803 F.2d 1541 (11th Cir.1986), the regulations implementing the Medical Reimbursement Program were silent as to specific educational costs. Rather, the regulations provided for reimbursement of "allowable costs," which were defined as those costs necessary and proper and appropriate in developing and maintaining the operation of patient care facilities. *Id.* at 1544. In finding that the educational costs were "allowable," the Eleventh Circuit was presented with uncontradicted evidence by expert witnesses that the teachers were actively involved in the therapeutic treatment of the patients. *Id.* at 1546. This involvement was illustrated by such factors as the teacher-therapists being housed in the unit with the children and the actual time spent in the program not being credited as full-time public school attendance. *Id.* Plaintiff's claims are not identical—it produced no expert in the field of therapeutic treatment; it sought reimbursement for costs incurred for extra paper work and daily behavior assessments; and it was operating under regulations that explicitly excluded educational costs.

The other case that plaintiff is relying on is *Vista Hill Found., Inc. v. Heckler,* 767 F.2d 556 (9th Cir.1985). Here, again, the same regulation as in *Charter Peachford* was at issue, which made no reference to educational costs. Similarly, the Ninth Circuit found the testimony of the expert doctor to be convincing on the issue of the education being therapeutic. The witness stated that part of the treatment was to learn to do the job of going to school and to learn to do the job of learning. *Id.* at 558. Furthermore, the doctor testified that entrance to the program was by doctor's order, the progress was documented in the patient's medical chart, and the program was supervised by the hospital's medical staff. *Id.* at 560. Plaintiff's claims are, likewise, not identical to these facts so as to justify a similar holding.

The recommended decision of the hearing officer, incorporated in the CHAMPUS formal decision, clearly shows that every relevant factor of the plaintiff's claim was considered, and this Court can find no indication of an error of judgment to warrant a ruling that the agency acted in an arbitrary and capricious manner. Further, the decision was supported by substantial evidence in the record. There is no question of the clarity of the agency's path to its decision—it was reasonable and clearly discernible. *See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. at 43, 103 S.Ct. at 2866.

## IV. Untimeliness of CHAMPUS' Actions

### A. *Prejudice and Deprivation*

Plaintiff here charges that the delay of CHAMPUS in releasing the results of the first audit resulted in prejudice to the plaintiff because it was deprived of the opportunity to mitigate the overpayments. By failing to notify the plaintiff of the alleged violations, the plaintiff asserts that it was "entrapped by silence" into continuing its practices when it would have stopped immediately once notified. This issue was also presented to the hearing officer and was discussed in the CHAMPUS final decision.

In response to the plaintiff's argument that most of the overpayments in the first audit and all of those relating to the second

audit could have been avoided if the plaintiff had been given the audit report at the same time it was given to CHAMPUS, the hearing officer found that the testimony of one of the plaintiff's witnesses refuted the basis of such an argument. The Vice-President of Administration (David E. Brown) testified that the waiver practice was discontinued in early 1982 when he instituted new accounting procedures. He further testified that the bookkeeping practices were haphazard prior to his arrival at the plaintiff's institute, and in order to implement better accounting procedures, he made many changes, one of which had to do with the waiver procedure.

In concluding that this argument had no merit, the hearing officer found that "[t]he better reasoning * * * suggests, that the [plaintiff] could have mitigated its damages by getting its bookkeeping department into proper order at an earlier date." Adm. Rec., Exhibit A at 51.

Plaintiff has not established that the hearing officer's finding on this issue, which was later incorporated into the final decision, is arbitrary, capricious or without substantial evidence, necessitating that it be set aside. While it may have been advisable for CHAMPUS to furnish the audit findings to the plaintiff earlier than it did, the plaintiff's logic in its argument as to prejudice is flawed.

The Director of Personnel and General Services of the plaintiff, who was the responsible person on the plaintiff's staff to know about the billing procedures, testified that she was aware of the 25 percent requirement for retirees and that she had a Department of Defense Manual that contained the regulations in issue. Despite the agency's failure to furnish the first audit report to the plaintiff, it did send three separate letters to the plaintiff, one each year, specifically stating the beneficiary/sponsor's share could not be waived. Apparently, these letters were not sufficient to inform the plaintiff that such activity should cease. Plaintiff cannot now, however, claim that only the audit report would have rectified its behavior. Therefore, CHAMPUS' delay in furnishing the report to the plaintiff was not prejudicial or arbitrary and capricious.

Plaintiff also argues that CHAMPUS' delay in furnishing it with both audit reports resulted in the plaintiff's deprivation of an effective defense in the audit appeal. Specifically, plaintiff urges that, because of the delay, those auditors who conducted the first audit were no longer employed by the Government and thus were unavailable for examination.

While plaintiff acknowledges that Mr. Koch, who supervised the second audit, was available and did testify as to the findings of that particular audit, it alleges that several inconsistencies as to the first audit were left unresolved. The issues now before this Court arise from the same types of claims that were initially raised in both audits: waiver of beneficiary/sponsor liability and the inclusion of educational costs. Inconsistencies between these audits that later surfaced were recognized by the hearing officer and subsequently rectified. Any critical opinions or conclusions expressed in the first audit that were in question have been subjected to the full appeal process, and the plaintiff fails to mention any specific opinions that remain in dispute. Therefore, the Court is not convinced that the plaintiff has been deprived of an opportunity to defend itself adequately.

### B. *The Statute of Limitations and Recoupment*

█ As previously presented to the hearing officer, the plaintiff is again alleging that the statute of limitations bars CHAMPUS from pursuing any portion of the disallowances. While it is undisputed that the applicable statute of limitations is six years, as set forth in 28 U.S.C. §§ 2415–2416 (1982 & Supp. V 1987), the plaintiff asserts that the cause of action accrued when the Defense Audit Service (DAS) provided its initial audit report of November 14, 1979, to the Assistant Secretary of Defense for Health Affairs. The Government, on the other hand, asserts that the cause of action accrued in October 1980

when it received the first audit report pertaining to the plaintiff.

Since the initial determination of CHAMPUS was furnished to plaintiff on January 24, 1986, plaintiff maintains that CHAMPUS is barred from pursuing the collection of overpayment resulting from the first audit reporting period, *i.e.*, January 1, 1979, through August 31, 1980, since the six-year time constraint would have expired, having run from November 1979 to November 1985. According to the Government, the statutory time period has not expired as it commenced in October 1980 and would run until October 1986—nine months after the initial determination was provided.

The CHAMPUS final decision discussed this issue and concluded that plaintiff's argument must fail since the audit of the DAS in 1979 did not provide in-depth financial audits of any particular provider, nor did it provide any hard data as to the amount of waived benefits or other costs. Based on this lack of information, the hearing officer determined that the responsible Government official had no knowledge or could not have reasonably been expected to have knowledge that a claim on behalf of the United States existed in specific regard to the plaintiff. *See United States v. Bragg*, 493 F.Supp. 470 (M.D.Fla.1980).

In reaching this decision, the hearing officer relied on such factors as the "generalness" of the audit conducted by the DAS: it considered three RTCs in examining the failure of providers to collect beneficiary/sponsors' cost share (although the entire audit encompassed visits to six RTCs), but did not name these RTCs; it furnished no breakdown of the amounts attributable to each RTC for this practice; and it was silent as to the provider's practice of waiving this liability. The hearing officer concluded that only after the October 1980 audit report, which specifically concerned the plaintiff, did the agency have any direct knowledge that a claim existed on behalf of the Government against the plaintiff. Thus, the recoupment of funds relating to the first audit period was found not to be barred by the statute of limitations contained in 28 U.S.C. §§ 2415–2416.

Therefore, the CHAMPUS final decision, as to the statute of limitations not barring recoupment, is not arbitrary and capricious, but rather the result of a reasoned consideration of the evidence and the relevant factors of the issue. Furthermore, this Court finds that there is substantial evidence in the record to support that decision.

The statute of limitations accrues when all the events have occurred which fix the alleged liability of the defendant and entitle the plaintiff to institute an action. *Hopland Band of Pomo Indians v. United States*, 855 F.2d 1573, 1577 (Fed.Cir.1988). Here, the events that fixed the alleged liability against the plaintiff had not occurred until it was determined, via the October 1980 audit report, that the plaintiff had, indeed, waived the beneficiary/sponsor liability. The general audit report of the DAS of November 14, 1979, merely reported that this practice had been discovered without naming names or in any way indicating if one, two, or all of the RTCs studied had been engaged in this practice. Without a named party, the Government did not have a defendant to pursue. On the other hand, if the Government had promptly initiated an action against all the RTCs contacted during the DAS audit, based on those findings alone, the Government may well have been charged with filing frivolous suits based on unfounded claims.

The plaintiff relies on *United States v. Gavilan Joint Community College Dist.*, 849 F.2d 1246 (9th Cir.1988) to support its argument to this Court that the statute commenced with the DAS audit. In that case, the GAO audited participating schools in the Predischarge Education Program and found that the schools had received surplus funds. The Ninth Circuit concluded that the statute of limitations commenced with this initial audit and not at the completion of the Veterans Administration's own audit. *Id.* at 1249–50. Uncertainty as to the exact amount of the overpayments alone would not suffice, according to the court, to constitute lack of knowledge of a fact material to the right of

action. *Id.* Rather, the important factor was when the Government first discovered it had a claim against the plaintiff. *Id.* at 1250.

In the case now before this Court, CHAMPUS did not know and could not have known it had a claim against Woods until the first audit involving the plaintiff was completed, since the plaintiff was not named in the DAS audit as an offender. Furthermore, as pointed out by the final decision, CHAMPUS is not relying merely on the fact that the exact amount of overpayments was unknown, as in *Gavilan*—that was only one of the facts that remained unknown until the first audit.

Based on the foregoing reasons, plaintiff's contentions as to the statute of limitations are not supported and cannot be sustained. The cause of action accrued upon the completion of the first audit in October 1980, triggering the statute of limitations, and the determination issued on January 24, 1986, is, therefore, within the six-year time period.[10]

In final summary, the plaintiff has failed to convince this Court that the final CHAMPUS decision was arbitrary or capricious, not based on substantial evidence or wrong as a matter of law. Moreover, this Court finds that the CHAMPUS regulations are procedurally and substantively valid and not contrary to the statute. Lastly, the timeliness of CHAMPUS' actions did not unduly prejudice the plaintiff nor were they barred by the statute of limitations.

## CONCLUSION

For the reasons discussed above, the plaintiff's motion for summary judgment is denied, and the Government's cross-motion for summary judgment is granted. Plaintiff's complaint is to be dismissed.

Each party is to bear its own costs.

---

10. The Government contends that administrative offsets, 28 U.S.C. § 2415(i), are not subject to the six-year statute of limitations, 28 U.S.C. § 2415(a), and thus, would withstand any challenge of the statute of limitations. Although it is not necessary for the Court to decide the validity of this argument in view of the Court's decision on the statute of limitations, if the issue were to be resolved, this Court would uphold the offset. It appears that all the requirements of the administrative offset provisions, 31 U.S.C. § 3716, have been fulfilled. Regulations were prescribed outlining the procedures for the collection by recoupment or offset of erroneous CHAMPUS payments, 50 Fed.Reg. 52,315–27 (1985), and the claim has not been outstanding for more than ten years nor does the statute explicitly prohibit using administrative offsets to collect the claim. Furthermore, as provided by 31 U.S.C. § 3716(a), written notice of the claim, the amount, the intent of CHAMPUS to collect the claim through offset, and an explanation of Woods' rights were provided in the initial decision issued on January 24, 1986.